737 A.2d 1

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. ROBERT R. SIMON, DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued September 29, 1998—Decided August 11, 1999.

422

*Marcia H. Blum,* Assistant Deputy Public Defender and *Paul M. Klein,* Deputy Public Defender II, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Linda A. Rinaldi,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

On October 8, 1996, defendant, Robert Simon, pled guilty to burglary, theft, unlawful possession of a firearm, possession of a weapon for an unlawful purpose, felony murder, and purposeful and knowing murder by his own conduct of Sergeant Ippolito Gonzalez, a Franklin Township police officer. A jury sentenced defendant to death. This is defendant's direct appeal from his conviction for capital murder and sentence of death. *See R.* 2:2–1(a)(3). We affirm all of the convictions as well as the sentence of death.

I

On May 6, 1995, defendant and Charles Staples were members of the Warlocks motorcycle gang. On that day, they burglarized

the Environmental Heating building in Franklin Township, located only a few buildings away from the Franklin Township Police Headquarters. As Officer Kenneth Siderio was driving to the police station to work the 11:00 p.m. shift that night, he observed a vehicle parked in front of the Environmental Heating building. Officer Siderio noticed a man dressed in black, later identified as defendant, emerge from the loading dock area and lean into the passenger side window of the parked vehicle as if he was talking to someone. When Officer Siderio passed the parked vehicle, he observed another man, later identified as Staples, sitting in the front seat. Suspecting that a burglary was in progress, Officer Siderio informed Officer Kenneth Crescitelli of his suspicions when he arrived at the police station. Officer Crescitelli left to investigate.

Meanwhile, Sergeant Gonzalez, who was on patrol at the time, pulled up behind the vehicle and turned on his patrol car's flashing lights. Apparently because his patrol vehicle was not equipped with a mobile data terminal, Sergeant Gonzalez called into head-quarters at 10:29 p.m. to report the stop and to request a look-up of the vehicle's plate number. He was informed that the car was registered to Charles Staples. When Officer Crescitelli pulled out of the police headquarters' parking lot, he observed Sergeant Gonzalez standing on the driver's side of the vehicle with some papers in his hand talking to the driver. Deciding that nothing looked unusual, he returned to the police station. However, about four minutes after Officer Crescitelli returned to the police station, Sergeant Gonzalez requested backup.

Both Officer William Clay, who had also observed Sergeant Gonzalez at the window of the parked vehicle, and Officer Cresci-telli responded to Sergeant Gonzalez's request. Before they could reach the scene, however, each of them heard a gunshot. Other witnesses heard a total of two gunshots about ten seconds apart. Officer Clay, being the first to arrive at the scene, observed Staples drive his vehicle from the scene. When Officer Crescitelli drove up, Officer Clay instructed him to pursue Staples and

radioed for other units to join the pursuit. Soon thereafter, Staples lost control of his vehicle and slammed into a guardrail. Defendant exited the vehicle from the passenger side, pointed his gun toward Officer Crescitelli, and ran. Officer Crescitelli yelled at defendant to stop; when defendant failed to heed the warning, Officer Crescitelli fired three shots at him. One of the shots struck defendant in the leg. Defendant flipped over the guardrail and yelled, "I give up. I'm shot." Both defendant and Staples were arrested at that point.

Automobile insurance and registration cards were found in the vehicle with a bullet hole through them. Defendant's Social Security Card and Staples' driver's license were found underneath Sergeant Gonzalez's leg with a bullet hole through them. An expert testified that the hole in the insurance card was made by a gun fired from a distance of 20 to 40 inches. The police found coins, several watches and rings, a Japanese $5 bill, and several rifles in the vehicle, all of which belonged to occupants of the Environmental Heating building.

Sergeant Gonzalez was shot twice. The medical examiner opined that the first shot passed through the right side of his neck, knocking him down, but was not fatal. The second and fatal shot entered his skull behind his right ear; the bullet lodged in his brain. A firearms expert testified that the gun found near the guardrail where defendant was apprehended was the murder weapon.

On August 3, 1995, a Gloucester County Grand Jury indicted defendant and co-defendant Charles Staples on the following charges: purposeful and knowing murder, each by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(1) and (2) (counts one and two); felony murder, contrary to *N.J.S.A.* 2C:11–3a(3) (count three); second-degree burglary, contrary to *N.J.S.A.* 2C:18–2 (count four); third-degree theft, contrary to *N.J.S.A.* 2C:20–3 (count five); third-degree unlawful possession of a firearm, contrary to *N.J.S.A.* 2C:58–4 and 39–5b (count six); and second-degree possession of a weapon for an unlawful purpose, contrary

to *N.J.S.A.* 2C:39–4a (count seven). Defendant was also charged with an additional count of second-degree possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a (count nine). Count eight was only against co-defendant Staples; it charged him with second-degree eluding a law enforcement officer, contrary to *N.J.S.A.* 2C:29–2. Because the State did not know whether defendant or Staples was the trigger-person who killed Sergeant Gonzalez, it decided to charge both of them with purposeful and knowing murder by his own conduct and require the jury to determine which one actually was the killer.

-A-

### Guilty Pleas

On Monday, October 7, 1996, before the commencement of the guilt-phase trial, defendant announced to the trial court his intention to plead guilty to all of the charges against him, including the murder. Prior to giving his guilty plea, defendant stated:

> About a week ago I think it was I came into the court and said I wanted to fire these guys, my attorneys, for reasons that they were incompetent and deceitful and I would not feel safe going into court with them and then the next day you told me, I think it was the next day, you told me, well, you have to take them, that's it, you're going to use these guys, even after there was a conflict of interest.
>
> Now, to avoid all this conflict of interest and everything, I'm going to enter a plea of guilty right now and maybe it will help out my co-defendant. I don't see a reason for both of us going down the tubes.

The trial court explained to defendant that if he pled guilty, he would be giving up the presumption of innocence, the right to a trial by jury, the right to testify on his own behalf before a jury, the right to present any defenses, the right to confront and call witnesses, and the right to file any additional motions that may assist him in his defense. Defendant stated that he understood that he would be giving up each of those rights, and that he still wanted to plead guilty.

In response to defendant's preliminary statement, defense counsel informed the trial court that they were taken by surprise by defendant's desire to enter a guilty plea because each time they

had discussed a potential guilty plea with him, defendant had said he intended to plead not guilty. Defense counsel believed that defendant was pressured into pleading guilty. To support that claim, defense counsel showed the trial court a newspaper article that stated that members of the Warlocks motorcycle gang were urging defendant to change his plea to guilty. Additionally, one of the members of the Warlocks gang, who was present in the courtroom the week before defendant pled guilty, was seen punching his fist into his palm. On that same day, defendant was handed a note containing the phone number of the president of the local Warlocks chapter. When defense counsel asked defendant if he had been threatened, defendant responded that he could not tell them, but that he did not have a choice and it was not his decision. Defendant also advised counsel that he would be able to try to save his own life at the penalty trial once Staples' guilt-phase trial had been concluded.

As a follow-up to defense counsel's assertion of potential threats, the trial court conducted an in-camera meeting with defendant and his counsel and asked defendant if he had been threatened. Defendant responded that no one had threatened him, and that he was entering a guilty plea of his own free will. Later, he told the trial court that part of the reason for his choice to plead guilty was that he did not want to go to trial with his attorneys. Yet when the trial judge asked if new lawyers would make a difference, defendant responded no and reasserted that he wanted to plead guilty in order to help Staples. When asked whether he saw the man punching his fist into his palm, defendant explained: "I think I may have caught a glimpse of it, yeah. He was like come on, man, do the right thing, like that. Yeah, all right. It wasn't like, you know, hey, man, you better get it right or something." The trial court also asked defendant if he would cooperate with his attorneys at the penalty phase of the trial and whether he wanted to die. Defendant responded that he was not going to commit suicide, but that he did not care if he died.

Based on defendant's statements, the court decided to proceed with the guilty plea proceedings. After defendant was administered the oath, he informed the trial court that he understood the "plea agreement" he had signed and that he was feeling well and not intoxicated. The trial court repeated many of the prior questions that had been asked of defendant during the in-camera meeting regarding why defendant was pleading guilty and whether he understood the consequences of pleading guilty. Defendant repeated his responses from the in-camera meeting.

In an attempt to obtain the factual basis for the proposed guilty pleas, the trial court asked defendant about the events on the night of the murder. Defendant testified that he exited Staples' vehicle to talk to Sergeant Gonzalez. He explained: "When I got out of the car Officer Gonzalez was going for his gun and I just wanted him away from me, your Honor. I went for mine and I shot him." Defendant estimated that he was six feet from Sergeant Gonzalez when he fired the gun. The trial court then questioned defendant concerning his purpose in shooting Sergeant Gonzalez and whether he intended to kill him. Defendant explained: "I intended to cause to get him away from me.... I intended to get him away from me, your Honor. I guess if that took killing him, you know." He also testified that, although he did not aim the gun at the victim, shooting Gonzalez in the upper body or head is what it took to get Gonzalez away from him. He said that he intended to shoot Gonzalez, and that he intended the bullet to hit Gonzalez, rather than warn or scare him. He explained that his purpose in shooting Sergeant Gonzalez was to cause him serious bodily harm or to kill him, if that is what it took to get him away from him.

Defendant admitted that after Gonzalez had been shot, he and Staples attempted to flee the scene. They stopped only when their car crashed. After the crash, defendant exited the vehicle, pointed his gun toward Officer Crescitelli, and tried to run before the officer shot him in his leg, causing him to fall down and

surrender. Defendant said he obtained the gun from underneath Staples' mattress while Staples was in the bathroom.

To contradict defendant's assertion that Sergeant Gonzalez drew his gun first, the prosecutor informed the court that the physical evidence at the scene and eyewitness accounts, indicated that the officer's gun remained in its holster, and that he had not removed either of the two snaps essential to removing the gun from its holster. The prosecutor also stated that based on ballistic evidence, the shooter was two to three feet away from Sergeant Gonzalez when the fatal shot was fired.

The trial court accepted defendant's guilty plea on October 8, 1996. On the same day, the State dismissed the capital murder charge against Staples. On February 7, 1997, a jury convicted Staples of felony murder.

Six days after the jury returned the felony-murder conviction of Staples, defendant made a motion to withdraw his guilty pleas on February 13, 1997. A hearing on the motion was conducted on February 27, 1997. Although defendant alleged that his guilty pleas should be vacated because he was coerced into pleading guilty, defendant refused to identify any individuals who had threatened him, except to mention that he had spoken to a person who had threatened him over the phone. Defendant also stated that he was required to plead guilty to "take most of the weight" for Staples and to protect himself and his family. Ultimately, the trial court denied defendant's motion to withdraw his guilty pleas, concluding that defendant's testimony at the plea hearing was more credible, and that he testified falsely during the motion hearing.

-B-

*Penalty Trial*

Jury selection for the penalty phase trial was conducted between March 3 and March 24, 1997. The State relied on four aggravating factors: (1) that defendant murdered Sergeant Gon-

zalez, a public servant, while Gonzalez was in the performance of his official duties, *N.J.S.A.* 2C:11–3c(4)(h); (2) that Sergeant Gonzalez was murdered while defendant was engaged in flight after committing burglary, *N.J.S.A.* 2C:11–3c(4)(g); (3) that the murder of Sergeant Gonzalez was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense or offenses committed by defendant, namely burglary and theft, *N.J.S.A.* 2C:11–3c(4)(f); and (4) that defendant previously had been convicted of another murder, *N.J.S.A.* 2C:11–3c(4)(a). The State presented evidence regarding the events of May 6, 1995. The State also established that in 1982, defendant was convicted of second-degree murder for killing a nineteen year-old woman in Pennsylvania for which he was sentenced to ten to twenty years in prison.

The defense, under the "catch-all" mitigating factor, *N.J.S.A.* 2C:3c(5)(h), proffered 126 mitigating circumstances related to defendant's life. The enormous amount of mitigating evidence included evidence of defendant's tragic childhood, which was replete with physical and verbal abuse from his parents, drug abuse, and petty theft-type offenses such as breaking and entering and writing bad checks. Between the ages of seventeen and twenty-three, defendant lived as an outlaw motorcycle gang member, committing multiple thefts and regularly using drugs. Shortly after his twenty-fourth birthday, defendant was sentenced to five to ten years in prison for offenses ranging from aggravated assault to burglary. While serving those sentences, defendant was convicted in 1982 for the Pennsylvania murder that was used as an aggravating factor in this case. In 1984, defendant killed an inmate and was placed in isolation for six and one-half years. He was acquitted of the 1984 inmate killing because it was committed in self-defense. The defense also presented expert testimony that defendant suffered from an antisocial personality disorder, and that by the time he reached adulthood he had no moral compass.

On April 2, 1997, the jury unanimously found all four aggravating factors proffered by the State. The jury also found thirty-

seven of the mitigating factors unanimously and forty-eight of the mitigating factors non-unanimously. Despite the large number of mitigating factors found in defendant's favor, the jury unanimously found that the four aggravating factors together outweighed the mitigating factors beyond a reasonable doubt. Defendant was accordingly sentenced to death.

## II

### *Grand Jury Indictment*

Defendant contends that the capital murder indictment was invalid and should have been dismissed for two reasons: (1) there was no *prima facie* showing that defendant killed Sergeant Gonzalez by his own conduct; and (2) the prosecutor violated defendant's due process rights by suggesting, in response to a grand juror's question, that a capital murder charge may be based on accomplice liability.

The trial court denied defendant's motion to dismiss the indictment, ruling that the grand jury was not required to consider the "own conduct" requirement. The trial court also found that the prosecutor's response to the grand juror's question was not misleading, and that there was evidence before the grand jury that reasonably could have lead to an ultimate finding that either defendant or co-defendant killed the victim by his own conduct, even though the evidence pointed "more strongly to one than the other."

### -A-

### *Sufficiency of "Own Conduct" Evidence*

Defendant argues that it was improper for the State to charge both him and Staples with capital murder when it was clear that only one of them killed Sergeant Gonzalez. Because the State was not clear on which one of them was the killer, defendant contends that there was insufficient evidence to prove that he committed Sergeant Gonzalez's murder by his own conduct. Defendant also

points out that guideline two of the *Prosecutor's Guideline for Designation of Homicide Cases for Capital Prosecutions,* which was adopted by the New Jersey County Prosecutors Association and the Attorney General in 1989, provides that a prosecutor "must be satisfied that there is proof beyond a reasonable doubt that the defendant, by his own conduct, actively and directly participated in causing the death of the victim."

*Rule* 3:7–3b requires that an indictment for murder specify whether the act is murder as defined by *N.J.S.A.* 2C:11–3a(1), (2) or (3), and whether or not it is alleged that the defendant committed the murder by his or her own conduct, paid another to commit the murder, or is the leader of a drug-trafficking network who secured the murder in furtherance of a conspiracy.

A grand jury may return an indictment if there is a *prima facie* showing that the accused has committed a crime. *State v. New Jersey Trade Waste Ass'n,* 96 *N.J.* 8, 27, 472 *A.*2d 1050 (1984). For the crime of purposeful or knowing murder, the prosecutor was not required to state in the indictment whether the murder was committed by defendant's own conduct. The "own conduct" requirement is not an element of purposeful or knowing murder; it is "merely a triggering device for the death penalty phase of the trial." *State v. Gerald,* 113 *N.J.* 40, 99, 549 *A.*2d 792 (1988) (quoting *State v. Moore,* 207 *N.J.Super.* 561, 576, 504 *A.*2d 804 (Law Div.1985)).

The "own conduct" requirement is analogous to the filing of a notice of aggravating factors that a prosecutor must file before subjecting a defendant to a capital trial. We have stated:

> Like the indictment, the notice of aggravating factors is the turn-key to a capital prosecution. Implicit in both is the notion that the allegations derive from some verifiable source. The need to ensure that such a source exists compels some preliminary review to satisfy the interest of the public and the defendant that such charges not proceed to trial without a factual mooring.
>
> [*State v. McCrary,* 97 *N.J.* 132, 143, 478 *A.*2d 339 (1984).]

Under *McCrary,* the prosecutor must show that there was sufficient evidence to allege the aggravating factors. *Id.* at 140–41,

478 *A*.2d 339. That means that when a prosecutor indicts a person for capital murder, he or she must, among other requirements, (1) make a *prima facie* showing to the grand jury that the person committed the murder, and (2) present some evidence that one of the triggering devices applies to the facts of the case.

■ Defendant's reference to the *Prosecutor's Guideline for Designation of Homicide Cases for Capital Prosecution* does not weigh into our decision. The standard stating that a prosecutor "must be satisfied that there is proof beyond a reasonable doubt that the defendant, by his own conduct, actively and directly participated in causing the death of the victim" is only a guideline establishing uniformity for prosecutors to follow when determining whether to seek the death penalty. It holds no legal significance.

■ Our examination of the record convinces us that there was a sufficient amount of evidence before the grand jury against both defendants which, if believed, reasonably could lead to a finding that either defendant or Staples murdered Sergeant Gonzalez by his own conduct. Because Simon is the defendant in this appeal, we will focus only on the evidence against him. The grand jury was presented with evidence that Simon was the passenger and that the shot was fired from the passenger side of the vehicle. In addition, Simon exited the passenger side of the vehicle with the murder weapon in his hand after the crash. That evidence satisfies the State's burden of making a *prima facie* showing that defendant murdered Sergeant Gonzalez by his own conduct. Hence, the indictment was proper.

■ We also reject defendant's contention that the State could not charge him and Staples with capital murder because it was clear that only one of them murdered Sergeant Gonzalez. In *State v. Clausell*, 121 *N.J.* 298, 580 *A*.2d 221 (1990), two defendants were indicted for capital murder. The Court noted that the petit jury found both Clausell and his co-defendant guilty of purposeful and knowing murder, and found that Clausell, but not his co-defendant, had committed the homicidal act by his own conduct. *Id.* at 312, 580 *A*.2d 221. This Court neither questioned

nor criticized the fact that two defendants, in a single-shooter murder, were charged with capital murder for killing the same victim, and that the petit jury was left to decide, if it could, who was the actual shooter. Similarly, in *State v. Brown*, Brown and a co-defendant were both indicted for capital murder, although a jury did not have to decide who actually killed the victim by his own conduct because Brown's co-defendant pled guilty. 138 *N.J.* 481, 651 *A.*2d, 19 (1994), *overruled on other grounds* by *State v. Cooper*, 151 *N.J.* 326, 700 *A.*2d 306 (1997).

▪ In addition, the Legislature specifically discussed situations in which there were more than one participant in a murder when drafting the death penalty statute. The Legislature noted that an accomplice to a murder would not be subjected to the death penalty, but that when the line between principal and accomplice was blurred, it is "up to the jury" to "decide who pulled the trigger." Public Hearing Before Senate Judiciary Committee on Senate Bill No. 112 (Death Penalty) at 18 (Feb. 26, 1982). We conclude that as long as there is sufficient evidence for the State to make a *prima facie* showing that each defendant committed the murder by his or her own conduct, the State is permitted to charge more than one defendant with capital murder, even where it is clear that only one person actually killed the victim by his own conduct.

-B-

*Prosecutor's Instructions to the Grand Jury*

▪ Defendant also contends that the prosecutor misled the grand jury into thinking that a person may be liable for capital murder despite not being the shooter. The issue is posed in the context of the following colloquy between a grand juror and the prosecutor:

JUROR: With the first two charges, they're both being charged with murder.
MR. LYNCH: Yes, sir.
JUROR: I want to make sure that I got it right. That there's felony murder; okay. The way that it's worded is they worked together and they caused

somebody's death. But, murder, is it required—the fact that they were there and didn't pull the trigger, does that constitute murder under the law?

MR. LYNCH: There is accomplice liability under the law which I will review with you. By the wording of these two charges, accomplice liability is not being alleged, direct participation is being alleged against the two individuals. Accomplice liability could be considered by the panel. It could be made a separate charge against both or either defendant that he acted as an accomplice, but the allegation that's set forth in the charges that you're being asked to consider that I've reviewed with you is direct participation and causation rather than accomplice liability. Is that responsive to your question, sir? Does that help you?

JUROR: I think so; yeah.

Defendant contends that the prosecutor's answer was misleading because it did not inform the grand jury that accomplice liability does not apply to capital murder. Defendant argues that if the grand jury had understood that only the shooter could be convicted of capital murder, they might not have been willing to indict both him and Staples, but rather would have required more evidence regarding who was the shooter.

The foregoing colloquy does not reveal that the prosecutor's responses improperly infringed upon the grand jury's decision-making function. The prosecutor's response made it clear that an indictment was sought charging both Simon and Staples with direct participation in Sergeant Gonzalez's murder. The prosecutor explained that accomplice liability was not alleged in the two murder counts, but that accomplice liability could be considered by the panel in other connections. The grand juror who asked the question said the answer was clear. Therefore, we reject defendant's speculation that the grand jury was misled.

III

*Voluntariness of Guilty Plea to Capital Murder*

Defendant contends that his right to due process of law was violated when the trial judge accepted his guilty plea. He claims that his guilty plea was not made voluntarily and that he was motivated by threats against his family and himself. He argues that despite his insistence that his plea was voluntary at the plea hearing, the totality of the information before the court at the time

of the plea required a finding of coercion. Defendant points to the following evidence that should have persuaded the court to find that he had been coerced:

1. Simon announced his decision to plead guilty immediately after the intervention of the Warlocks' officers;

2. Simon believed he might well defeat the capital aspect of the case and could offer no good reason for purposefully risking his life by pleading to capital murder;

3. Simon received no legal benefit in exchange for the plea; and

4. Counsel believed Simon was entering the plea under duress and urged the court not to accept the plea.

The importance of the constitutional rights being waived when a defendant enters a guilty plea necessitates that the knowing and voluntary nature of the plea be demonstrated in the record so that it may be reviewed on appeal. *Boykin v. Alabama*, 395 *U.S.* 238, 243, 89 *S.Ct.* 1709, 1712, 23 *L.Ed.*2d 274 (1969). "In New Jersey, it is well-settled that a plea must be entered into voluntarily and intelligently. Indeed, we have codified that requirement in *Rule* 3:9–2." *State v. Crawley*, 149 *N.J.* 310, 318, 693 *A.*2d 859 (1997) (internal citations omitted). *See also State v. Barboza*, 115 *N.J.* 415, 421 n. 1, 558 *A.*2d 1303 (1989) (stating "[a] guilty plea violates due process and is, thus, constitutionally defective if it is not voluntary and knowing"). *Rule* 3:9–2 provides, in part:

The court, in its discretion, may refuse to accept a plea of guilty and shall not accept such a plea without first addressing the defendant personally and determining by inquiry of the defendant and others, in the court's discretion, that there is a factual basis for the plea and that *the plea is made voluntarily, not as the result of any threats or of any promises or inducements* not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea.

[Emphasis added.]

When a guilty plea is challenged as the product of coercion, the relevant question is not whether defendant was "sensitive to external consideration—many defendants are—but instead whether the decision to plead was voluntary, *i.e.*, a product of free will." *United States v. Pellerito*, 878 *F.*2d 1535, 1541 (1st Cir.1989), *cert. denied*, 502 *U.S.* 862, 112 *S.Ct.* 184, 116 *L.Ed.*2d

145 (1991). The withdrawal of a guilty plea is not an "absolute right"; it is a matter within the broad discretion of the trial court. *United States v. Spencer,* 836 *F.*2d 236, 238 (6th Cir.1987); *United States v. Ramos,* 810 *F.*2d 308, 311 (1st Cir.1987).

Generally, representations made by a defendant at plea hearings concerning the voluntariness of the decision to plead, as well as any findings made by the trial court when accepting the plea, constitute a "formidable barrier" which defendant must overcome before he will be allowed to withdraw his plea. *Blackledge v. Allison,* 431 *U.S.* 63, 74, 97 *S.Ct.* 1621, 1629, 52 *L.Ed.*2d 136 (1977). That is so because "[s]olemn declarations in open court carry a strong presumption of verity." *Ibid.; State v. DiFrisco,* 137 *N.J.* 434, 452, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996). When the trial court determines that a guilty plea has been voluntarily entered, "the measure of what constitutes fair and just reason for withdrawal must be reposed in the sound confidence of the [trial] court." *State v. Smullen,* 118 *N.J.* 408, 417, 571 *A.*2d 1305 (1990); *see also R.* 3:21–1. "A guilty plea voluntarily entered should not generally be vacated in the absence of some plausible showing of a valid defense against the charges." *State v. Gonzalez,* 254 *N.J.Super.* 300, 303, 603 *A.*2d 516 (App.Div.1992). Thus, the trial court's denial of defendant's request to withdraw his guilty plea will be reversed on appeal only if there was an abuse of discretion which renders the lower court's decision clearly erroneous. *Smullen, supra,* 118 *N.J.* at 416, 571 *A.*2d 1305.

We find no such abuse of discretion in this case. The trial court considered all of the evidence presented to support defendant's motion to withdraw his guilty plea. After reviewing the evidence and hearing the arguments, the court stated that the essential issue it had to decide was whether defendant lied to the court during the two-day plea process, or whether he had lied at the withdrawal hearing. The court concluded that based on observations of defendant's demeanor over "many hours" during the plea process, defendant's motion testimony on a "vague,

nonspecific asserted threat" made to members of his family was "totally incredible and unpersuasive." The trial court flatly rejected defendant's testimony, and concluded that "he lied on the witness stand this morning." The trial court concluded that defendant's withdrawal application was nothing more than an "attempted manipulation" of the criminal justice system.

The trial court's finding that defendant was lying on the witness stand during the hearing on his withdrawal motion was supported by the statements defendant made during his plea hearing. At that hearing, both in camera and in open court, defendant stated under oath numerous times, in numerous ways, that he had not been coerced or threatened at any time, in any manner, by anyone. Defendant told the court that he wanted to plead guilty in order to help Staples. That was a plausible explanation since there was strong evidence that defendant was the trigger person. When asked about each of the statements made by defendant, and scenarios involving defendant in which a court could find coercion, defendant effectively explained each situation to the satisfaction of the trial court.

As an appellate court, we are required to give great " 'deference to those findings of the trial [court] [that] are substantially influenced by [its] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.' " *State v. Locurto*, 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (quoting *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964)). Indeed, one of the reasons the trial court denied defendant's motion was based on its comparative observations of defendant's demeanor during the plea hearing and the plea withdrawal hearing. The trial court gave defendant ample opportunity in camera and in open court to reveal that he was pleading guilty involuntarily. However, defendant did everything within his power to successfully convince the trial court that he was pleading guilty of his own free will. Significantly, defendant provided no convincing evidence at the plea withdrawal hearing that he or his family had in fact been threatened.

Thus, we conclude that the trial judge's findings of facts were not clearly erroneous. As a result, defendant's plea was made voluntarily and the trial court properly denied the motion to vacate the plea.

## IV

### *Simon's Plea Establishing Capital Murder*

Defendant contends that even if this Court were to find that his plea was voluntary, his plea failed to establish that he was the gunman or that he committed the murder purposefully or knowingly. Specifically, defendant argues that his statements during the plea hearing only admitted to recklessness, which is the *mens rea* for aggravated manslaughter, not purposeful or knowing murder. In addition, defendant asserts that his statements implicating himself as the gunman were not supported by the evidence from the scene. Therefore, he urges the Court to vacate his conviction and death sentence.

When taking the plea, the trial court asked defendant to explain the factual basis for his plea of guilty to capital murder. Defendant responded that when he got out of the car, Sergeant Gonzalez was going for his gun and defendant wanted Sergeant Gonzalez away from him, so defendant pulled his gun and shot the victim. He stated that he shot Sergeant Gonzalez to get Sergeant Gonzalez away from him, because he did not want to go back to prison. When asked if he intended to kill the officer, defendant responded "I intended to get him away from me, your Honor. I guess if that took killing him, you know." Defendant said he shot Sergeant Gonzalez two times while standing within six feet of him, and he thought the victim was struck in the head or neck and in the chest. Defendant was asked "are you guilty of killing Officer Gonzalez knowing that what you were doing was practically certain to result in his death or serious bodily injury?" Defendant responded: "I knew I was going to cause [a lot] of injury to him, yes, sir. Like I said, I didn't care about his death. I didn't think of that. So, yeah, okay, guilty, yes, sir."

The trial court was satisfied that defendant's guilty plea, when considered in conjunction with other information made available to the court pursuant to *Rule* 3:9–2, established capital murder. In accepting the plea, the trial court stated that defendant did, without justification, "knowingly and purposely fire two shots into the body [of Sergeant Gonzalez] at close range . . . and that he did so . . . by his own conduct." The trial court further stated that defendant "pulled the trigger and fired the shot and that he did so under circumstances in which it was practically certain and that he knew that it was practically certain that doing that would result in serious bodily injury, if not death, and that the circumstances under which he did this, at close range, two shots, not one, to the upper body . . . area, manifested a reckless indifference as to whether or not death would result."

-A-

### *Mens Rea*

Defendant contends that his factual statements to the trial court regarding his mental state at the time of the shooting only satisfied a recklessness state of mind and not purposeful or knowing murder. The State argues that because the New Jersey Constitution was amended in 1992, three years before the present murder, to permit capital punishment of a defendant who purposely or knowingly caused serious bodily injury resulting in death as opposed to an intent to cause death, the law did not at the time of the present murder require defendant to admit in his guilty plea that he intended to kill Sergeant Gonzalez. *See Cooper, supra,* 151 *N.J.* at 361, 700 *A.2d* 306; *State v. Harris,* 141 *N.J.* 525, 548, 662 *A.2d* 333 (1995). The State maintains that when defendant fired the second shot at the officer's head, which resulted in the bullet entering his brain, common sense would mandate the conclusion that defendant's conduct was almost certain to cause death or serious bodily injury resulting in death.

*N.J.S.A.* 2C:2–2b defines the three mental states involved here. "A person acts knowingly with respect to a result of his conduct if

he is aware that it is practically certain that his conduct will cause such a result." *N.J.S.A.* 2C:2-2b(2). "A person acts purposefully with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result." *N.J.S.A.* 2C:2-2b(1). *N.J.S.A.* 2C:2-2b(3) states that "[a] person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."

■ Because the Legislature has made serious bodily injury murder subject to the death penalty at least since May 5, 1993, *L.* 1993, *c.* 111, following a 1992 constitutional amendment, the State does not have to prove that a defendant purposefully or knowingly killed a victim to establish a capital murder as long as the State proves that the defendant purposefully or knowingly caused serious bodily injury resulting in death. *Cooper, supra,* 151 *N.J.* at 361, 376-77, 700 *A.2d* 306.

■ The 1992 constitutional amendment made SBI murder death eligible when the actor "purposely or knowingly caus[es] serious bodily injury resulting in death." *N.J. Const.* art. I, ¶ 12. That amendment, however, did not define "serious bodily injury." The 1993 amendments to the Death Penalty Act implementing the 1992 constitutional amendment did not alter the Code's existing definition of serious bodily injury: "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *N.J.S.A.* 2C:11-1b. When the Code's definitions of "serious bodily injury" are considered in conjunction with the 1992 constitutional amendment, it becomes apparent that only purposely or knowingly causing serious bodily injury "which creates a substantial risk of death" can satisfy the

SBI capital murder requirement. Objectively speaking, an injury that creates a substantial risk of death means one from which death is practically certain to ensue. Thus, in order to convict a defendant of SBI capital murder, a prosecutor must prove that a defendant purposely or knowingly caused an injury from which death is practically certain to ensue.

This Court addressed the difference between purposeful and knowing murder and aggravated manslaughter in *State v. Rose*, 112 *N.J.* 454, 479–85, 548 *A.*2d 1058 (1988). The facts of *Rose* were strikingly similar to this case except that there was no guilty plea. The defendant in *Rose* shot a police officer out of "panic" because he "did not want to get caught." *Id.* at 480–81, 548 *A.*2d 1058. The trial court denied defendant's request for a jury instruction on aggravated manslaughter. *Id.* at 479, 548 *A.*2d 1058. This Court affirmed the defendant's conviction for knowing or purposeful murder because there was no rational basis for the jury to conclude that the defendant was not aware of the consequences of his actions. *Id.* at 485, 548 *A.*2d 1058. The Court stated, "[d]efendant's statement that he 'panicked, did not want to get caught,' does not constitute a rational basis for a jury to conclude that defendant was merely reckless [as opposed to acting purposely or knowingly] and thus unaware that firing the shotgun into [the victim's] abdomen was 'practically certain' to cause his death." *Ibid.*

 Similarly, in this case defendant informed the trial court that he was practically certain that shooting Sergeant Gonzalez would cause his death. Defendant's argument that his intention was to get the officer away from him because he did not wish to return to prison does not constitute a rational basis for a judge or jury to conclude that defendant acted recklessly, as opposed to acting purposely or knowingly, and thus, unaware that firing two shots within six feet at Sergeant Gonzalez's upper body region was "practically certain" to cause death or serious bodily injury that results in death.

In addition to defendant's own words, common sense informs us that when someone shoots at another person in the upper body region, such as the neck and head, the shooter's purpose is either to cause serious bodily injury that results in death or to actually cause death, especially where no other plausible explanation is given. Although defendant claims he did not specifically aim his gun at Sergeant Gonzalez's upper body region, he admits that he intended the bullet to hit the victim and that his purpose in shooting Sergeant Gonzalez was to cause serious bodily injury if not to kill him. Moreover, the circumstances under which defendant shot the victim—at close range, two shots, not one, to the upper body region—manifested an indifference to whether the victim was killed instantly or eventually died from the infliction of serious bodily injury. Therefore, defendant's plea established that he had the requisite *mens rea* for purposeful or knowing murder pursuant to *N.J.S.A.* 2C:11-3a(1) and (2), and the trial court did not err in finding that defendant acknowledged a mental state required for capital murder.

The State's assertion based on the trial court's statement that defendant's conduct was, at the very least, a reckless disregard for whether Sergeant Gonzalez's death would result from the shots fired into his body, is simply another way of saying that when defendant purposely shot the victim he was practically certain that death would ensue. The source of that language used by the trial court comes from the Model Jury Charge in Capital Cases referred to as the "Gerald 'Trigger' Issue Charge." That charge in part provides:

> To find defendant guilty of murder all jurors must unanimously agree that defendant purposely or knowingly caused death or that he purposely or knowingly caused serious bodily injury resulting in death *with reckless indifference as to whether his conduct would cause death*, or that he purposely or knowingly caused serious bodily injury resulting in death, but all jurors do not have to agree unanimously as to which form of murder is present so long as all believe it was one form of murder or the other. However, for a defendant to be subject to capital punishment, all jurors must agree that the defendant either purposely or knowingly caused death or serious bodily injury resulting in death *while demonstrating reckless indifference as to whether his conduct would cause death.*
>
> [Emphasis added.]

That language undoubtedly was inserted into the charge in an attempt to inform the jury that under the Code's definition of serious bodily injury, not every purposeful or knowing stabbing or shooting or conduct of an actor that results in death will satisfy the SBI capital murder requirements as opposed to intentional murder under *N.J.S.A.* 2C:11–3a(1) and (2). In other words, since the post-*Gerald* constitutional amendment, does a SBI capital murder require proof that the actor acted with purpose or knowledge that death would result from his or her conduct? The simple answer is no. The above charge was formulated based on this Court's statement that after the post-*Gerald* constitutional amendment, the jury charge "should clarify that the mental state required for a capital conviction based on SBI murder should be consonant with the federal constitutional mandate in *Tison v. Arizona*, 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), that the actor be recklessly indifferent to whether the result of the conduct would be death." *Harris, supra,* 141 *N.J.* at 548, 662 *A.*2d 333.

*Tison* and *Enmund v. Florida,* 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982), the cases that persuaded the Court in *Harris* to use the phrase "recklessly indifferent to whether the result of the conduct would be death," both dealt with statutes permitting a sentence of death for felony murder based on accomplice liability. Those strict liability crimes occurred without the capitally convicted defendants sharing the required intent to kill or the intent to inflict serious bodily injury upon the victims. However, the rationale for the reckless indifference standard articulated in *Tison* and *Enmund* is unnecessary to ensure death worthiness in SBI capital murders given the structure of our Code. A death-eligible offense in New Jersey under the Code has built into it other sufficient protections.

First, felony murderers are not eligible for the death penalty under the Code. *N.J.S.A.* 2C:11–3c. Second, the requirement that a defendant "committed the homicidal act by his own conduct" generally precludes accomplice and co-conspirator liability from

triggering death eligibility. *Ibid.* The only exceptions are limited to those persons "who as an accomplice procured the commission of the [murder] by payment or promise of payment of anything of pecuniary value," *N.J. Const.* art. I, ¶ 12; *N.J.S.A.* 2C:11–3c; and leaders of a narcotics trafficking network who in furtherance of a conspiracy to traffic in narcotics command or by threat or promise solicited the commission of murder. *N.J.S.A.* 2C:11–3c. The limited accomplice and co-conspirator liability provisions have built-in-protections that render unnecessary the protections required by *Tison* and *Enmund.*

Although the reckless indifference phrase was used in the present case to refer to the circumstances under which defendant acted and did not refer to defendant's state of mind, in a SBI capital murder case in which aggravated manslaughter pursuant to *N.J.S.A.* 2C:11–4 is also charged to the jury, the use of the reckless indifference language to describe both the defendant's state of mind in the aggravated manslaughter charge and the circumstances under which he or she acted in the SBI capital murder charge conceivably could lead to some confusion. Because this case involved a guilty plea to capital murder, there was no confusion in the trial court's finding that defendant had the requisite mental state for capital murder. Nonetheless, the "Gerald 'Trigger' Issue [Jury] Charge" should be re-examined by the Trial Judges Committee on Capital Causes.

-B-

*Factual Basis for Guilty Plea*

Next, defendant argues that the factual basis for his guilty plea was inadequate. First, defendant contends that there was no factual basis to support his statement that he was the gunman because the State lacked sufficient evidence to identify the trigger person. Second, defendant argues that the court erred when it failed to make a factual finding that the evidence corroborated defendant's claim that he was the trigger person. We reject both claims.

 *Rule* 3:9–2 provides, in pertinent part, that "[t]he court, in its discretion, ... shall not accept [a] plea without first ... determining by inquiry of the defendant and others ... that there is a factual basis for the plea." *See, e.g., State v. Eisenman,* 153 *N.J.* 462, 471, 710 *A.*2d 441 (1998) (observing that defendant may provide factual basis for guilty plea during plea colloquy). When a defendant is charged with capital murder, however, "no factual basis shall be required from the defendant" as long as the court is satisfied that a factual basis for the plea has been established from the proofs presented. *State v. Jackson,* 118 *N.J.* 484, 488, 572 *A.*2d 607 (1990); *see also State v. Davis,* 116 *N.J.* 341, 372, 561 *A.*2d 1082 (1989) (stating "a capital defendant should not be disadvantaged by a plea requirement that he or she furnish the factual basis for the plea"). The purpose of the Rule is to avoid forcing "defendant[s] exposed to the death penalty ... to state anything that can support an aggravating factor." *Jackson, supra,* 118 *N.J.* at 489, 572 *A.*2d 607; *see Davis, supra,* 116 *N.J.* at 371, 561 *A.*2d 1082.

 In the present case, there was not only a factual basis to support defendant's guilty plea, but also the trial court expressly made a factual finding that the evidence supported defendant's claim that he was the gunman. During the plea hearing, defendant specifically stated that he exited the passenger side of the vehicle to talk to the officer, that Staples was driving, and that he had been out of the car "less than 10 [seconds]"—"4, 5 seconds, 6 maybe ... [s]omewhere in that [range]," before he shot the officer twice. He informed the court that Sergeant Gonzalez "was going for his gun and I just wanted him away from me ... I went for mine and shot him." Defendant even admitted firing his gun within six feet or so of the victim.

Further, the evidence from the scenes of the murder and the arrest support defendant's statement that he was the passenger because he exited the vehicle from the passenger's side at the scene of the arrest. Defendant was in possession of the murder weapon when he ran from the vehicle. Forensic evidence sup-

ports defendant's statement that Sergeant Gonzalez was shot twice and that he was shot from a distance of six feet or less.

The trial court recognized all of the similarities between defendant's statements at the plea hearing and the extrinsic evidence. After listening to defendant's plea statements, reviewing a transcript of a taped statement recorded by Sergeant Clay just a few hours after the shooting, Clay's investigative report, and the autopsy report, the trial court observed:

> I'm satisfied that [Simon] has provided a sufficient factual basis to establish, along with the exhibits that have been submitted in evidence, that he is guilty.
>
> I'm satisfied that with respect to the capital murder count that he did, without any justification, whatsoever, knowingly and purposefully fire 2 shots into the body at close range, within several feet, standing within 6 feet and with his arms—his arm that was holding the gun partially extended, fired these 2 shots into the body of Sergeant Gonzalez and that he did so, therefore, by his own conduct.

We, therefore, agree with the trial court that there was a sufficient factual basis for defendant's guilty plea and that the corroborating evidence establishes that defendant's admission that he was the trigger person was trustworthy. *See State v. Roach*, 146 *N.J.* 208, 229, 680 *A.*2d 634, *cert. denied*, 519 *U.S.* 1021, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996) (holding "evidence and inferences to be drawn from the evidence were sufficient for the jury to determine that the confession was trustworthy").

## V

### *"Prior Murder" Aggravating Factor*

The c(4)(a) prior murder aggravating factor involved a January 13, 1974, murder in Pennsylvania for which defendant was convicted of second-degree murder. He argues that because the Pennsylvania conviction was congruent with both manslaughter and some forms of murder under *N.J.S.A.* 2C:11–3a, and because it cannot be determined whether, under the jury charge in Pennsylvania, he was convicted of murder or aggravated manslaughter under New Jersey law, the Pennsylvania conviction should not have been used as an aggravating factor.

The pertinent provision in our Death Penalty Act, *N.J.S.A.* 2C:11–3c(4)(a), provides that one of the aggravating factors justifying the imposition of the death penalty is that "[t]he defendant has been convicted, at any time, of another murder." Whether the Legislature intended that a foreign second-degree murder conviction that occurred prior to the enactment of our Death Penalty Act in 1982 could be used as an aggravating factor has to be determined from the statutory language, the legislative history, and our decisional law. Because no clear answer emerges from the statutory language itself, "[w]e must, therefore, resort to intrinsic and extrinsic aids of statutory interpretation to glean the legislative intent." *State v. Biegenwald,* 96 *N.J.* 630, 635, 477 *A.*2d 318 (1984). First, we will consider the historical antecedents to the c(4)(a) statutory language that will be somewhat enlightening. *State v. Brown,* 22 *N.J.* 405, 415, 126 *A.*2d 161 (1956).

-A-

The Criminal Law Revision Commission (Commission) in 1971 proposed the New Jersey Penal Code (Proposed Code). When the Commission began its study, the murder statutes in New Jersey and Pennsylvania were virtually identical. In fact, New Jersey had followed the Pennsylvania model when it divided murder into first and second degrees. II *Final Report of the New Jersey Criminal Law Revision Commission* 168 (1971) (Final Report). The Code as proposed by the Commission redefined murder to consist of criminal homicides that were committed purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life, and felony murder. *N.J.S.A.* 2C:11–3a (Proposed Draft 1971).

The Proposed Code also established the death penalty and provided death eligibility for a purposely committed murder and for felony murder. *N.J.S.A.* 2C:11–3b, –3a(1), –3a(4) (Proposed Draft 1971). One of the proposed "aggravating circumstances" that would subject a defendant to the death penalty was the fact that he or she previously had been convicted of "murder, man-

slaughter, robbery, aggravated rape, aggravated sodomy, kidnapping or other crime involving the use of violence to the person." *N.J.S.A.* 2C:11–7c(2) (Proposed Draft 1971).

Some of the provisions of the Proposed Code were enacted in 1978 as the New Jersey Code of Criminal Justice (Code). *L.* 1978, *c.* 95, effective September 1, 1979. However, the Proposed Code's death penalty and aggravating circumstances provisions were not adopted as part of the Code. In addition, the Code reduced the scope of murder from that contained in the Proposed Code by defining murder as follows:

> a. Except as provided in *N.J.S.* 2C:11–4 [manslaughter] criminal homicide constitutes murder when:
>
> (1) The actor purposely causes death or serious bodily injury resulting in death; or
>
> (2) The actor knowingly causes death or serious bodily injury resulting in death; or
>
> (3) It is committed when the actor [commits felony murder.]
>
> [*N.J.S.A.* 2C:11–3a.]

Thus, the Code as enacted defines three types of murder: "purposeful murder (with intent to kill or to inflict serious bodily injury), knowing murder (with knowledge/awareness that death or serious bodily injury will occur), and felony murder." *Cooper, supra,* 151 *N.J.* at 359, 700 *A.*2d 306.

Approximately two and one-half years after the Code became effective, a Death Penalty Act was introduced in the Senate as Senate Bill No. 112. That Bill also included a prior murder as an aggravating factor. Specifically, it provided: "The defendant has previously been convicted of murder for which a sentence of life imprisonment or death was imposable, or [felony] murder under 2C:11–3(a)(3)." *Senate Bill No. 112* lines 121–25. Before enactment, the Attorney General suggested that the proposed language be broadened to provide "(a) [t]he defendant has previously been convicted of murder." Public Hearing Before Senate Judiciary Committee on Senate Bill No. 112 (Death Penalty) at 14 (Feb. 26, 1982).

Thus, under the Proposed Code, the previously convicted felon death-eligibility trigger included the three common law degrees of

homicide, first-degree murder, second-degree murder and manslaughter; most of the common-law felonies; and any other crimes that involved the use of violence. When the Death Penalty Act was introduced after the Code had become effective, the previously convicted felon aggravating factor was reduced to prior murders "for which a sentence of life imprisonment or death was imposable, or [felony] murder under 2C:11–3(a)(3)." *Senate Bill No. 112* lines 121–25. Although the record does not reflect the legal analysis that inspired the Attorney General to suggest, or the Legislature to accept the suggestion, that all terms modifying the prior murder aggravating factor be dropped, we find substantial legal reasons for the change.

That the prior murder aggravating factor contained in Senate Bill No. 112 was limited to those for which a sentence of life imprisonment or a sentence of death could have been imposed meant that, under pre-Code law, only first-degree murder was contemplated. Felony murder was first-degree murder. *N.J.S.A.* 2A:113–2 to –4 (repealed 1978); *Cooper, supra,* 151 *N.J.* at 360, 700 *A.*2d 306. Under prior law, first-degree murder was the only homicide that made a defendant eligible for death or a life sentence. *N.J.S.A.* 2A:113–4 (repealed 1978); *State v. Maguire,* 84 *N.J.* 508, 520 n. 12, 423 *A.*2d 294 (1980); *State v. Funicello,* 60 *N.J.* 60, 68, 286 *A.*2d 55, *cert. denied,* 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972). All homicides were presumed to be murder in the second degree. *N.J.S.A.* 2A:113–4 (repealed 1978); *State v. Bess,* 53 *N.J.* 10, 17, 247 *A.*2d 669 (1968). In contrast, the maximum punishment for second-degree murder was thirty years of imprisonment. *Bess, supra,* 53 *N.J.* at 18, 247 *A.*2d 669. That maximum sentence exposure would have precluded second-degree murder as a prior murder aggravating factor as originally proposed in Senate Bill No. 112. By accepting the Attorney General's suggestion, the Legislature agreed that it did not intend to be that restrictive. We conclude that when the Legislature adopted the Attorney General's suggested change, it intended to make any prior murder committed by a defendant at any time and at any place an aggravating factor.

-B-

We are also persuaded that the Code's early sentencing options for murder support the conclusion that the c(4)(a) prior murder aggravating factor includes foreign judgments of convictions for murder in the first or second degree. From the inception of the Code there were two sentencing options for murder: (1) a sentence of thirty years of which the defendant must serve fifteen years without parole, and (2) an extended term sentence between thirty years and life, with a mandatory minimum of twenty-five years of parole ineligibility, *N.J.S.A.* 2C:11-3b; *N.J.S.A.* 2C:43-7a(1) and b. A third sentencing option of a different extended term was available in the Code as enacted in 1978. *N.J.S.A.* 2C:11-3b; *Maguire, supra,* 84 *N.J.* at 521, 423 *A.*2d 294. That option was eliminated, however, when the death penalty became available in 1982. *State v. Serrone,* 95 *N.J.* 23, 26, 468 *A.*2d 1050 (1983). Nonetheless, this Court has concluded that the extended term option that was repealed when the Death Penalty Act became effective is an indication that the Legislature intended the Code's definition of "prior conviction" used as part of the criteria for extended term sentencing, *N.J.S.A.* 2C:44-3, also be used when considering sentencing issues related to murder. *Biegenwald, supra,* 96 *N.J.* at 636, 477 *A.*2d 318. A prior murder conviction in another jurisdiction satisfies the Code's definition of a "prior conviction." *N.J.S.A.* 2C:44-4c. "It is not unreasonable to surmise that the Legislature intended the definition of 'prior conviction,' as articulated in *N.J.S.A.* 2C:44-4b, to apply to *N.J.S.A.* 2C:11-3c(4)(a) as well." *Biegenwald, supra,* 96 *N.J.* at 636, 477 *A.*2d 318.

This Court also has held that a prior murder conviction under our former Title 2A, now repealed, satisfies the prior murder conviction aggravating factor under *N.J.S.A.* 2C:11-3c(4)(a). *State v. Ramseur,* 106 *N.J.* 123, 272-75, 524 *A.*2d 188 (1987). Additionally, the Court has allowed an out-of-state prior murder conviction to satisfy the c(4)(a) aggravating factor. *State v. Koedatich,* 112 *N.J.* 225, 265-66, 548 *A.*2d 939 (1988), *cert. denied,* 488

*U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). Although the method for establishing the existence of prior convictions vary between jurisdictions, New Jersey has adopted a statutory procedure as simple as the introduction of a judgment of conviction. *N.J.S.A.* 2C:44–4d. *See generally Spencer v. Texas,* 385 *U.S.* 554, 87 *S.Ct.* 648, 17 *L.Ed.*2d 606 (1967) (upholding Texas procedure for enforcing its habitual criminal statutes through allegations in indictment of prior offenses and introduction of proof respecting past convictions with charge by court that such matters are not to be taken into account in assessing defendant's guilt or innocence).

-C-

We reject defendant's contention that the State was obligated to prove that Pennsylvania's prior second-degree murder conviction satisfies the murder requirements of *N.J.S.A.* 2C:11–3a(1) or (2). In 1970, the Appellate Division, in a non-capital case, rejected the argument that before a foreign conviction may be used for sentence enhancement, the State must prove that the foreign conviction was equivalent to, or congruent to, a similar criminal offense in this State. *State v. Hines,* 109 *N.J.Super.* 298, 305–06, 263 *A.*2d 161 (App.Div.), *certif. denied,* 56 *N.J.* 248, 265 *A.*2d 703, *cert. denied,* 400 *U.S.* 867, 91 *S.Ct.* 108, 27 *L.Ed.*2d 106 (1970). The court in *Hines* held that to determine whether Pennsylvania burglary and larceny convictions were similar to New Jersey's requirements for similar offenses, a court need only examine the indictment and the nature of the evidence presented that led to the convictions. *Ibid.* That approach has been accepted in a capital case as well. In *Ramseur,* defendant contended that his prior conviction for the murder of his wife should not be used as a c(4)(a) aggravating factor in his capital punishment trial because his *non vult* plea to the indictment for that murder made it unclear whether the jury found him guilty of manslaughter or murder. *Ramseur, supra,* 106 *N.J.* at 272, 524 *A.*2d 188. In rejecting that argument, the Court held that for sentence enhancement, a court should "not look behind the fact of the conviction

because the conviction itself is the statutory aggravating factor." *Id.* at 276, 524 *A.*2d 188. That rationale remains sound for domestic and foreign convictions because the statute refers to a prior conviction "at any time, of another murder." *N.J.S.A.* 2C:11–3c(4)(a).

Ordinarily, the State proves the existence of a prior murder conviction as an aggravating factor by simply introducing into evidence a judgment of conviction. *N.J.S.A.* 2C:44–4d; *State v. Biegenwald,* 126 *N.J.* 1, 13, 594 *A.*2d 172 (1991). The judgment of conviction for a prior murder is introduced into evidence during the penalty phase of a trial for the limited purpose of aiding the jury in its determination of whether to impose a life or death sentence. Because a prior murder conviction is not relevant to guilt, and a penalty jury is not concerned with guilt, definitions of the elements that comprised the prior murder conviction cannot affect the value of the prior murder conviction to the deliberating jury in the penalty phase.

Similarly, other states have concluded that prior foreign convictions can be established for sentence enhancement purposes without looking behind the facts, provided that the foreign convictions satisfy the home state's statutory aggravating factor requirement. *Miller v. State,* 280 *Ark.* 551, 660 *S.W.*2d 163, 165 (1983); *People v. Guest,* 115 *Ill.*2d 72, 104 *Ill.Dec.* 698, 503 *N.E.*2d 255, 267 (1986), *cert. denied,* 483 *U.S.* 1010, 107 *S.Ct.* 3241, 97 *L.Ed.*2d 746 (1987); *State v. Taylor,* 304 *N.C.* 249, 283 *S.E.*2d 761, 780 (1981), *cert. denied,* 463 *U.S.* 1213, 103 *S.Ct.* 3552, 77 *L.Ed.*2d 1398 (1983); *Grasso v. State,* 857 *P.*2d 802, 808–09 (Okla.Crim.App.1993); *Commonwealth v. Maxwell,* 534 *Pa.* 23, 626 *A.*2d 499, 501–02, *cert. denied,* 510 *U.S.* 995, 114 *S.Ct.* 558, 126 *L.Ed.*2d 459 (1993). South Carolina reached a different conclusion when its Supreme Court ruled that a Virginia second-degree murder fell between South Carolina's crimes of murder and manslaughter. *State v. Norris,* 285 *S.C.* 86, 328 *S.E.*2d 339, 344–45 (1985), *overruled on other grounds, State v. Torrence,* 305 *S.C.* 45, 406 *S.E.*2d 315 (1991).

Even if the South Carolina approach was followed, and we were to look behind the foreign conviction, the prior Pennsylvania murder satisfies the requirements of our prior murder aggravating factor, *N.J.S.A.* 2C:11–3c(4)(a). Defendant was tried in Pennsylvania for first and second-degree murder of a former girlfriend, Beth Smith Dusenberg. The murder occurred on January 13, 1974. At that time, New Jersey and Pennsylvania defined first and second-degree murder essentially the same. *State v. Williams*, 30 *N.J.* 105, 114–15, 152 *A.2d* 9 (1959); *N.J.S.A.* 2A:113–2 (repealed 1978). As of January 1974, both states divided murder into first and second-degree offenses. In January 1974, murder was defined in Pennsylvania as follows:

(a) Murder of the first degree.—A criminal homicide constitutes murder of the first degree when it is committed by means of poison, or by lying in wait, or any other kind of willful, deliberate, and premeditated killing. A criminal homicide constitutes murder of the first degree if the actor is engaged in or is an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary, or kidnapping.

(b) Murder of the second degree.—All other kinds of murder shall be murder of the second degree. Murder of the second degree is a felony of the first degree.

[18 *Pa. Cons.Stat. Ann.* § 2502 (West 1998) (Historical and Statutory Notes).]

Pennsylvania required malice to be established as an element of both first and second-degree murder in 1974. *Commonwealth v. Boyd*, 461 *Pa.* 17, 334 *A.2d* 610, 613 (1975). Consistent with Pennsylvania law, the trial court in its jury charge defined malice as either "an express intent to kill or inflict great bodily harm, or of a 'wickedness of disposition, hardness of heart, cruelty, recklessness of consequences *and* a mind regardless of social duty' indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life." *Ibid.* (quoting *Commonwealth v. Carroll*, 412 *Pa.* 525, 194 *A.2d* 911 (1963)). The trial court also clarified its malice charge by informing the jury that "a killing is with malice if it is with the specific intent to kill and without any legal justification or excuse, or circumstances which would reduce the killing to voluntary manslaughter." First-degree murder was distinguished from second-degree murder based on willfulness, deliberateness, and

premeditation. *Commonwealth v. Jones,* 355 *Pa.* 522, 50 *A.*2d 317, 319 (1947).

Prior to enactment of the Code in 1979, murder was charged in a statutory form. The jury was required to designate whether the murder was first or second-degree for sentencing purposes. *Graves v. State,* 45 *N.J.L.* 347, 358 (E. & A. 1883); *State v. Paris,* 8 *N.J.Super.* 383, 385, 72 *A.*2d 558 (Law Div.1949). The law presumed that unlawful killings were second-degree murders. *State v. DiPaolo,* 34 *N.J.* 279, 294, 168 *A.*2d 401, *cert. denied,* 368 *U.S.* 880, 82 *S.Ct.* 130, 7 *L.Ed.*2d 80 (1961). The statutory form of murder simply codified the common law definition of murder prior to 1979. *Brown, supra,* 22 *N.J.* at 410, 126 *A.*2d 161. Like Pennsylvania, New Jersey required proof of malice for first and second-degree murder.

New Jersey defined malice as a state of mind to mean, "(a) [a]n intention to cause the death of, or grievous bodily harm to, any person, ... [and/or] (b) [k]nowledge that the act which causes death will probably cause the death of, or grievous bodily harm to, some person, ..., although such knowledge is accompanied by indifference whether death or grievous bodily harm is caused or not, or by a wish that it may not be caused." *State v. Gardner,* 51 *N.J.* 444, 458, 242 *A.*2d 1 (1968) (quoting *Great Britain, Royal Commission on Capital Punishment Report 1949–1953,* 27 (1953)). As difficult as malice has been to define, the essence of malice is an "evil or wicked state of mind." *State v. Williams,* 29 *N.J.* 27, 36, 148 *A.*2d 22 (1959).

We reject defendant's speculation that the Pennsylvania second-degree murder conviction could have been no more than manslaughter under our Code. First, passion/provocation or voluntary manslaughter as an available option in Pennsylvania in 1974 was presented to, and rejected by, the jury in the trial. Malice as defined by Pennsylvania and New Jersey was not an element of manslaughter. *Commonwealth v. Rife,* 454 *Pa.* 506, 312 *A.*2d 406, 410 (1973); *Williams, supra,* 29 *N.J.* at 36, 148 *A.*2d 22; *Brown, supra,* 22 *N.J.* at 411, 126 *A.*2d 161; *State v. Guild,* 10 *N.J.L.* 163

(Sup.Ct.1828). The jury's verdict finding defendant guilty of
second-degree murder is a clear finding that he acted with malice.
The fact that the jury rejected passion/provocation or voluntary
manslaughter as a potential verdict is further corroboration that
defendant acted with malice. Furthermore, our "pre-Code ana-
logue of passion/provocation manslaughter was referred to as
'voluntary manslaughter,' which typically involved an intentional
killing rather than one committed recklessly." *State v. Grunow,*
102 *N.J.* 133, 144, 506 *A.*2d 708 (1986) (quoting *State v. Powell,* 84
*N.J.* 305, 311, 419 *A.*2d 406 (1980)). Similarly, under the Code a
claim of "passion/provocation usually causes an intentional reaction
and that it is rare for passion/provocation to lead to recklessness."
*Grunow, supra,* 102 *N.J.* at 144, 506 *A.*2d 708.

Second, the victim of the second-degree murder in Pennsylvania
died from a gunshot wound to the head after being shot once in
the neck and once in the head. The fatal bullet entered between
her eyes. There was evidence presented to the jury that defen-
dant pulled a gun from his waistband and shot the victim after she
had called him a derogatory name. Although he was charged with
first-degree and second-degree murder, the jury reasonably could
have found the absence of premeditation or deliberation or both
based on the suddenness of defendant's response.

Third, under our Code, defendant's conduct reasonably
can be viewed as sufficient to satisfy a purposeful or knowing
murder rather than manslaughter. *N.J.S.A.* 2C:11–3a(1) or (2).
When the Pennsylvania court defined malice, use of the phrase
"recklessness of consequences and a mind regardless of social
duty indicating an unjustifiable disregard for the probability of
death or great bodily harm and an extreme indifference to the
value of human life," does not come close to being equivalent to
the recklessness standard required for manslaughter under
*N.J.S.A.* 2C:11–4. The phrase in the Pennsylvania malice charge
that included "recklessness" when viewed in the context of shoot-
ing the victim through the neck and between the eyes more closely
satisfies the definitions of acting purposely or knowingly, *N.J.S.A.*

2C:2–2b(1) and (2), than the definition of recklessness in *N.J.S.A.* 2C:2–2b(3). Recklessness can generally be distinguished from purposely and knowingly based on the degree of certainty involved. Purposely and knowingly states of mind involve near certainty, while recklessness involves an awareness of a risk that is of a probability rather than certainty. Shooting the victim between the eyes created a "practical certainty[ ] that death would result." *State v. Breakiron,* 108 *N.J.* 591, 606, 532 *A.*2d 199 (1987); *see Rose, supra,* 112 *N.J.* at 484, 548 *A.*2d 1058 (stating a person who fires a shotgun into the abdomen of another at point-blank range " 'is practically certain' that such conduct will cause the victim's death"); *State v. Tansimore,* 3 *N.J.* 516, 529, 71 *A.*2d 169 (1950) (stating that firing multiple shots into body of victim from close range creates a presumption of intent to kill). We conclude, therefore, that the foreign second-degree murder conviction was properly used as a c(4)(a) aggravating factor.

## VI

### *Jury Selection*

Defendant contends he should be given a new penalty-phase trial because he was denied his right to an impartial jury. He argues that because the trial court failed to excuse nine potential jurors for cause, he was forced to use nine peremptory challenges to excuse Harvey Beebe, Jr., Jeff Jenson, John Braddock, Anthony Pomorski, Timothy McGrorey, David Davenport, Arthur Fenska, Susan Frerks, and Barry LeFevre. Defendant claims that the court forced him to exhaust his peremptory challenges prematurely and that ultimately led to the seating of three biased jurors— Almyer Neigh, Diane Laudenbach, and Patricia Carlin.

The record reveals that defendant used a total of twenty-five peremptory challenges and the State used thirteen. Initially, defendant was granted twenty peremptory challenges. Once those challenges were exercised, he asked for and received four additional challenges. Defendant used seven of his first twenty challenges to excuse jurors he had challenged for cause during

*voir dire:* Harvey Beebe, Jr., Jeff Jensen, John Braddock, Anthony Pomorski, David Davenport, Timothy McGrorey, and Arthur Fenska. Of the four additional challenges allotted to defendant, two were used to excuse Susan Frerks and Barry LeFevre, both of whom defendant had challenged during *voir dire.* When defendant used his fourth challenge, Patricia Carlin, another juror defendant had challenged on *voir dire,* was seated in the jury box. The State then exercised a peremptory challenge, which caused Michelle Strano, another juror defendant had challenged during *voir dire,* to be seated on the jury box.

Defendant then requested two additional challenges. Although the court refused that request, it granted the State and defendant one additional challenge each. Defendant used his challenge to excuse Michelle Strano. The State excused one more juror after that, and then passed on its last opportunity to challenge. Thus, when the jury selection was concluded, Almyer Neigh, Diane Laudenbach, and Patricia Carlin became members of the sworn jury.

-A-

*Jurors Not Excused for Cause*

New Jersey has adopted the *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980), and *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985), approach to excluding prospective jurors for cause. *Harris, supra,* 156 *N.J.* at 168 n. 3, 716 *A.*2d 458; *Ramseur, supra,* 106 *N.J.* at 255-56, 524 *A.*2d 188. The test is "whether, in the trial court's discretion, the juror's beliefs or attitudes would substantially interfere with his or her duties." *Harris, supra,* 156 *N.J.* at 168 n. 3, 716 *A.*2d 458 (citing *Koedatich, supra,* 112 *N.J.* at 293, 548 *A.*2d 939). The party challenging the juror must demonstrate that "the juror's view would prevent or substantially impair the performance of that juror's duties in accordance with the court's instructions and the juror's oath." *DiFrisco II, supra,* 137 *N.J.* at 469, 645 *A.*2d 734; *Ramseur, supra,* 106 *N.J.* at 255, 524 *A.*2d 188. "Trial courts

possess considerable discretion in determining the qualifications of prospective jurors," which stems from "the inability of appellate courts to appreciate fully the dynamics of a trial proceeding." *DiFrisco II, supra,* 137 *N.J.* at 459, 645 *A.*2d 734.

Thus, since juror qualification is necessarily predicated upon the trial judge's observation of the jurors and his unique position to evaluate credibility and demeanor, the trial court's decision to include or exclude a juror from the jury pool will not be reversed absent an abuse of discretion. *Ibid.; State v. Hunt,* 115 *N.J.* 330, 348, 558 *A.*2d 1259 (1989); *Ramseur, supra,* 106 *N.J.* at 260, 524 *A.*2d 188. Factors to be considered when determining whether an alleged improper denial of a for-cause challenge requires a new trial are (1) whether the jurors were eventually removed; (2) the stage at which that occurred; (3) the effect on counsel's strategy; (4) any apparent unfairness to defendant; and (5) whether additional peremptory challenges were required. *Harris, supra,* 141 *N.J.* at 543, 662 *A.*2d 333.

It is not reversible error to fail to excuse a juror for cause who is thereafter peremptorily dismissed by a defendant who exhausts all his peremptory challenges as long as the deliberating jury is impartial. *DiFrisco II, supra,* 137 *N.J.* at 467, 470, 645 *A.*2d 734. However, erroneous failure to remove a juror for cause is reversible error if the defendant shows "(1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenge and that defendant exhausted his remaining challenges; and (3) that at least one of the remaining jurors that sat on the jury was a partial juror." *Id.* at 471, 645 *A.*2d 734.

Here, defendant argues that five of the nine jurors— Arthur Fenska, Anthony Pomorski, John Braddock, Susan Frerks, and Jeff Jensen—should have been dismissed for cause because they were not open to considering mitigating evidence. Each of those five jurors, however, stated he or she did not believe that the death penalty should automatically, or always, be imposed for

murder, or that it should be imposed on someone who had murdered before. They also repeatedly stated that he or she would be open to considering whatever mitigating evidence defendant presented.

Fenska specifically stated that in order for him to reach a decision, he would want to listen to "the whole case from start to finish" and that he would be willing and able to consider and weigh, with an open mind, mitigating evidence in making his final determination. Moreover, once Fenska had a better understanding of the penalty phase and mitigating evidence, he told the court that

> understanding a little more about the mitigating factors, you would have to weigh those. It's not just a person is guilty, but I have to weigh the mitigating factors along with the four other factors for the death penalty. . . . [The death penalty is] not automatic.

Similarly, Pomorski indicated he would need "all the facts" before making his decision. Although he was not certain how much weight he would give evidence of a defendant's character and background, he said he would be able to give such evidence his open, fair consideration and balance it against the aggravating factors.

Jensen was also uncertain about how much weight he would give the mitigating evidence of a defendant's character and background, but he repeatedly stated that he would have to "hear both sides" before making a decision and that he would be willing and able to consider the mitigating evidence with an open mind. He further stated that he would find certain mitigating evidence more compelling than other evidence; however, he explained that he would not automatically impose the death penalty.

Braddock also indicated that he would consider mitigating evidence of a defendant's character and background. However, he, too, felt restricted in his ability to gauge how much weight he would give certain mitigating evidence because he had no idea what evidence would be presented. He also stated that he would "use any information" that the court instructed him to use and that he would use that information with an open mind.

Frerks repeatedly indicated that the nature of the crime would not be the sole determining factor in her decision. She stated that she would want to consider "the person involved," including a defendant's upbringing and background. In fact, despite defendant's attempt to convince this Court that Frerks was totally offense-oriented in terms of mitigating factors, Frerks was very much open to ideas that "factor[ ] in people's background." Indeed, Frerks believed that as long as circumstances in a person's background were related to a determination of "what kind of person this ended up being and why they would do that at that point in time," then she would give the evidence its due weight.

Based on the totality of their responses, and having had the opportunity to observe their demeanor in the context of the overall setting, the trial court qualified each of those five jurors, fully setting forth its reasons for doing so in each instance. The court determined that Braddock was "articulate ... straightforward and not evasive" and would be able to follow the law as instructed by the court. The trial court found that Pomorski demonstrated a "sincere understanding" of his role as a juror, and that based on its "overall qualitative evaluation" of him, it was satisfied that his personal beliefs "would not substantially impair his ability to follow the law." Although the trial court found both Fenska and Jensen "close calls," it concluded that both would consider mitigating evidence fairly, with an open mind and give it whatever weight they each deemed appropriate. The court found Frerks to be "open[,] candid and sincere ... throughout her questioning" in that she would consider "any mitigation" evidence presented to her.

Considering the deference this Court must give to the trial court's evaluation of those jurors, especially when the court's reasons are thoroughly spelled out in the record, nothing in this record suggests that the trial court abused its discretion, or erroneously evaluated the credibility, demeanor and qualification of any of those five potential jurors. *See Harris, supra,* 141 *N.J.* at 543, 662 *A.*2d 333; *DiFrisco II, supra,* 137 *N.J.* at 466, 645 *A.*2d

734; *Hunt, supra,* 115 *N.J.* at 348, 558 *A.*2d 1259. Therefore, we find no abuse of discretion with regard to those five jurors and conclude that the trial court did not err in failing to remove those prospective jurors for cause.

With regard to Harvey Beebe, Jr., defendant claims he was substantially impaired because Beebe was pre-disposed toward the death penalty since a police officer was killed. However, while Beebe stated he had a "certain regard" for police officers, believing they are "there for [his] protection," he also stated that he had not formed any opinion on the outcome of the case and that he would be willing to vote against the death penalty even though the victim was a police officer. In fact, Beebe indicated he would not "be happy about" voting for the death penalty and that the decision "would be difficult for [him]." Moreover, he stated that he would want to know about defendant's background so that he could determine whether there were "things going on there that could ... warp a person to the point where they would" commit heinous crimes.

At the conclusion of Beebe's *voir dire,* the court stated that Beebe was "a balanced individual and not biased one way or another." The court found significant the fact that Beebe saw the importance in considering defendant's background, even when a police officer was killed.

After reviewing Beebe's *voir dire,* we reject defendant's contention that Beebe should have been excused. The totality of his *voir dire* showed that Beebe was, as the trial court found, "a balanced individual and not biased one way or another." In fact, Beebe was highly favorable to defendant because he thought voting for the death penalty would be difficult for him. Regardless, we find that the trial court did not abuse its discretion when failing to excuse Beebe for cause.

Defendant challenges Timothy McGrorey on the ground that he stated that he would consider premeditation and lack of remorse as aggravating factors when determining whether to

impose the death penalty. However, when defense counsel questioned him about his statement, McGrorey indicated that he would not automatically vote for the death penalty even where the murder was premeditated and the killer lacked remorse. He explained that he would want to hear the "background" of the defendant before making any decision, and that he only would consider the aggravating factors presented to him.

In qualifying McGrorey, the trial court noted that lay persons with no knowledge of the law "commonly" consider premeditation an important issue in deciding whether the death penalty might be an appropriate punishment. Nonetheless, the court was satisfied that McGrorey would not use premeditation as an aggravating factor and would follow the law and apply it as the court would instruct him.

Again, we find no abuse of discretion by the trial court. Looking at the totality of McGrorey's *voir dire*, it appears that he would have been willing and able to apply the law as instructed.

█ As for David Davenport, defendant contends that he should have been dismissed for cause because he never fully abandoned the view, as expressed in his questionnaire, that thirty years in prison would rarely be sufficient punishment for intentional murder. However, during *voir dire,* Davenport stated that he would "feel comfortable" imposing a thirty-year minimum prison sentence under "any set of circumstances," "[i]f that was the law."

The trial judge found Davenport to be a "a sincere and credible individual who was not in any way trying to fabricate answers or fashion answers in a particular way or conceal information, and who was being forthright and sincere in the responses that he gave." When reviewing Davenport's *voir dire* in its entirety, it is clear that following the law was important to him, and that he could have, and would have, set his personal feelings aside as the court would have instructed him to do in order to carry out his

functions as a juror. Therefore, we find that the trial court did not err in failing to excuse this potential juror for cause.

■ Finally, defendant claims that Barry LeFevre should have been excused for cause because his *voir dire* demonstrated that he was the type of person who was "hard-put not to vote for death," and because he had heard something about "a plea" on the radio. LeFevre's *voir dire,* however does not support defendant's positions. LeFevre was of the opinion that a minimum thirty-year prison sentence could be a sufficiently harsh sentence because some people "can possibly change as they grow older," and where appropriate "you have to give that person that small chance to do it." He further stated that he would not automatically vote for the death penalty, although, he believed that punishment would be appropriate "if there's nothing, no mitigating circumstances that can defend [defendant] from what he did." He also noted that he would not let his personal views interfere with his deliberation process because "each case has to be treated as an individual."

In terms of LeFevre's exposure to information about "a plea," nothing in the record indicates that he heard that defendant attempted to withdraw his plea. LeFevre stated that he had heard "something," "not directly with this case," about defendant's "alleged accomplice," "possibly regarding his plea with that case." But, when pressed, he said that he could not recall anything about the plea and that whatever he heard was very "brief," and was basically about defendant's alleged accomplice.

The trial court concluded that although LeFevre expressed "somewhat strong law and order type viewpoints," he was capable of being "open-minded and balanced in his evaluation of both aggravating and mitigating factors." With regard to the plea, the court stated that it was satisfied that what LeFevre heard was about Staples, not defendant, and that, in any event, whatever he heard was not enough for him to recall "anything of substance."

We agree with the trial court's assessment of LeFevre's *voir dire.* Although all potential jurors who knew about defendant's

attempt to change his plea were dismissed, it appears from the record that LeFevre did not know anything about defendant's attempt to change his plea and could barely remember anything about the story he had heard. We are satisfied that LeFevre could have deliberated with an open mind. Therefore, we find no abuse of discretion.

In sum, we reject defendant's contention that he should be given a new penalty phase trial because he was denied his right to an impartial jury. We find that the trial court did not err in failing to exclude any of the nine jurors challenged in this appeal.

-B-

*Biased Jurors*

Defendant contends that three deliberating jurors were biased. They are included in the group of jurors defendant should have excused for cause. Defendant argues that Almyer Neigh believed that the system was too lenient on criminals and that the constitutional protections of the accused serve to help the accused and that courts do nothing to help victims, leading to unjust results. According to defendant, Neigh said that he would impose death unless defendant could convince him that there was a reason for the shooting.

Of the three allegedly biased deliberating jurors, Neigh was among the first sixteen jurors seated. Although defendant had originally challenged Neigh for cause during *voir dire*, he by-passed him twenty-five times after Neigh was seated in the jury box. Thus, his claim of bias is certainly belied by the record. *DiFrisco II, supra,* 137 *N.J.* at 471–73, 645 *A.*2d 734. Apart from that, the trial court did not err by failing to excuse him for cause. Neigh told the court that he did not think that death should be automatic for killing a police officer. He stated that all circumstances should be considered and that he would be willing to vote against the death penalty if the mitigating factors equaled or outweighed the aggravating factors.

■ With regard to Diane Laudenbach, defendant argues that she was not impartial as indicated by her answer on the jury questionnaire which said that she would automatically impose a death sentence for "the purposeful and willful murder of an innocent person." Defendant further contends that Laudenbach gave inconsistent answers regarding whether she would vote for the death penalty if after considering all the evidence she was convinced that defendant willfully killed an innocent person.

Again, defendant's claim of bias is belied by the record because defense counsel passed her by twenty-three times to peremptorily challenge twenty-three other people. Furthermore, it is clear that Laudenbach should not have been excused for cause. Laudenbach stated that she believed the death penalty should not be automatic and that she would be willing to consider defendant's background and character.

■ As for Carlin, defendant contends that she placed the burden of proof on defendant to prove that death was not the appropriate punishment for an intentional killing. Defendant argues that her statements that she could set aside that belief were merely her attempts to search for the right answer. We disagree. Carlin stated that she believed that the death penalty should only be used "for some cases." She further indicated that each case had to be treated individually and that information about defendant's background was relevant to her evaluation of the appropriate sentence. Importantly, Carlin stated that she was open-minded and that given the information she had at that point in time, she was not leaning in one direction or the other, but was somewhere in the middle.

In addition, a review of the record reveals that defendant could have used his twenty-fifth and last peremptory challenge to remove Carlin, but instead he chose to remove Michelle Strano. Defendant removed Strano because her husband was removed for cause on the basis that he believed death should be automatic for someone who has killed more than one time. Defendant felt that Strano might feel some kind of pressure from her husband to vote

for death based on his views. The trial court, however, properly rejected this argument because each juror has to be qualified on his or her own merits, and because there was "no basis or reason to think" that Strano would not comply with the court's instruction not to discuss the matter with her husband. Therefore, since neither Carlin nor Strano should have been removed for cause, the record does not support defendant's assertion that Carlin was biased.

This Court simply cannot sanction defendant's point of view. To do so would allow a defendant to gain a new penalty-phase trial by simply arguing that while one juror was objectionable, another was more objectionable. Our system is designed for a defendant to have a fair jury, not the perfect jury. Therefore, we cannot grant relief where a defendant has had more than the twenty peremptory challenges *Rule* 1:8–3(d) allows and the jurors to which defendant objects were not required to be removed for cause. Thus, we reject defendant's contention that three biased jurors sat on his jury.

## VII

*Excusing Prospective Juror James Clevenger*

Defendant argues that the trial court erroneously excluded prospective juror James Clevenger. He contends that unlike the failure to dismiss a biased juror for cause, the erroneous exclusion of a prospective juror because of his or her opposition to the death penalty can never be harmless error. Thus, he seeks a reversal of his death sentence and a new penalty-phase trial.

In *Adams v. Texas, supra,* the United States Supreme Court held that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d 581; *see Davis v. Georgia,* 429 *U.S.* 122, 123, 97 *S.Ct.* 399, 400, 50 *L.Ed.*2d 339 (1976); *see also*

*Cooper, supra,* 151 *N.J.* at 352, 700 *A.*2d 306 (stating that a potential juror can be removed for cause based on that belief "if such views would substantially impair his or her ability to follow the law during the trial"); *Ramseur, supra,* 106 *N.J.* at 255–56, 524 *A.*2d 188 (recognizing the *Adams* test in death-qualifying a jury). "If a prospective juror is excluded on any broader grounds than his ability to follow the law or abide by his oath, the death penalty cannot be imposed." *Ramseur, supra,* 106 *N.J.* at 255–56, 524 *A.*2d 188. "[A] juror's bias for or against capital punishment need not be shown with 'unmistakable clarity.'" *State v. Pennington,* 119 *N.J.* 547, 588, 575 *A.*2d 816 (1990) (quoting *Ramseur, supra,* 106 *N.J.* at 256, 524 *A.*2d 188). In fact, trial courts possess broad discretion in determining whether a potential juror should be removed, and their determination will be disturbed only if that discretion is abused. *DiFrisco II, supra,* 137 *N.J.* at 460, 645 *A.*2d 734. This is because evaluating whether a potential juror is biased is a subjective decision based upon "an observation of the juror's demeanor during the course of *voir dire*—observations which an appellate court is precluded from making." *State v. Singletary,* 80 *N.J.* 55, 63, 402 *A.*2d 203 (1979).

During his *voir dire,* James Clevenger, a Quaker, stated that he did not believe in the death penalty. When asked whether matters of personal conscience and beliefs would prevent him from imposing a death sentence, Clevenger stated that he thought he could vote for the death penalty.

However, when questioned further by the prosecution, Clevenger explained that he had "religious qualms" about imposing the death penalty since the age of sixteen or seventeen, and only in rare cases where the defendant had committed an "execution style" murder would he have felt comfortable imposing the death penalty. He further stated that since imposing the death penalty is a subjective determination, he believed he would have a hard time reconciling his religious beliefs with his civic duties. In fact, he repeatedly told the court he would have a "tough time" in this respect.

Based on his *voir dire,* the trial court decided to excuse Clevenger for cause. The court told Clevenger that since imposing the death penalty would have forced him to decide between his personal conscience and his civic duty, he would be excused. The court stated, "I'm not going to ask you to do that, so you're excused."

■ We reject defendant's contention that Clevenger was removed for cause because he did not believe in the death penalty. From the explanation the trial court gave Clevenger, it is clear that he was not removed because he believed in the death penalty. Instead, he was removed because it was obvious that Clevenger's views about capital punishment would have substantially impaired his ability to follow the law, despite his pronouncement that he thought he could impose the death penalty if he was forced to make that decision. *See Singletary, supra,* 80 *N.J.* at 64, 402 *A.*2d 203 (stating a potential "juror's professions of impartiality will not always insulate him from excusal for cause"). Thus, the trial court was correct in not forcing Clevenger to decide between his personal conscience and his civic duty because it was not clear which one would have prevailed. Furthermore, since the trial court was in a position to accurately assess the sincerity and credibility of Clevenger's statements, we pay due deference to its evaluation. Therefore, we conclude that defendant is not entitled to a reversal of his death sentence or a new penalty-phase trial based on the excusal of Clevenger for cause.

## VIII

*Jury Instructions Regarding Mitigating Factors*

■ Defendant contends for the first time on appeal that his constitutional rights to a fair trial were violated when the trial judge instructed the jury that its decision to consider a mitigating factor should be unanimous, and that in order to spare defendant from a sentence of death the jury must find that the mitigating factors outweighed the aggravating factors. Because defendant

did not object to the jury instruction during the penalty-phase trial, the issue is raised as plain error. Under that standard, defendant must demonstrate that the jury instruction was clearly erroneous, and that it caused the jury to reach a verdict it otherwise would not have reached. *State v. Jordan*, 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997); *State v. Macon*, 57 *N.J.* 325, 335, 273 *A.*2d 1 (1971); *R.* 2:10–2. Defendant is unable to satisfy that standard.

The objective of jury instructions is to assist the jurors in applying the law to the facts presented in order to reach a verdict. *DiFrisco II, supra*, 137 *N.J.* at 491, 645 *A.*2d 734; *State v. Martini*, 131 *N.J.* 176, 271, 619 *A.*2d 1208 (1993) (*Martini I* ). When an appellate court reviews jury instructions, the court must examine the challenged language in the context of the entire charge. *Cupp v. Naughten*, 414 *U.S.* 141, 146–47, 94 *S.Ct.* 396, 400, 38 *L.Ed.*2d 368 (1973); *DiFrisco II, supra*, 137 *N.J.* at 491, 645 *A.*2d 734.

In a capital case, a jury must be instructed that in order to impose the death penalty, it must be satisfied beyond a reasonable doubt that the statutory aggravating factors outweigh all of the mitigating factors. *N.J.S.A.* 2C:11–3c(3)(a); *State v. Biegenwald*, 106 *N.J.* 13, 63–67, 524 *A.*2d 130 (1987). Aggravating factors must be found unanimously by the jury. *State v. Bey*, 112 *N.J.* 123, 159, 548 *A.*2d 887 (1988) (*Bey II* ); *State v. Zola*, 112 *N.J.* 384, 433, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). On the other hand, mitigating factors can be found non-unanimously. *Bey II, supra*, 112 *N.J.* at 159–61, 548 *A.*2d 887. As long as one juror finds any mitigating factor exists that is not outweighed beyond a reasonable doubt by the aggravating factors, the jury may not impose a sentence of death. *Id.* at 161, 548 *A.*2d 887.

In this case, defendant challenges the following statement made by the trial court:

You are asked here to indicate below one, and only one, choice which is the decision of the jury. You have three choices. First choice is, the jury is unanimously satisfied that any aggravating factor or factors proven to exist fail to outweigh the

*mitigating factor or factors. So that if all 12 of you conclude that there are one or more mitigating factors and that those mitigating factors in the judgment of each of you equal or outweigh the aggravating factors, that's the other way of saying it, then you unanimously agree that death is not the appropriate sentence.*

[Emphasis added.]

Defendant contends that the trial court committed reversible error in telling the jurors: (1) that all of them had to conclude that there are one or more mitigating factors, and (2) that such mitigating factor or factors must be equal to or outweigh the aggravating factors. The State answers by asserting that notwithstanding the above quoted partial charge, the trial court repeatedly informed the jury that it did not have to be unanimous in finding mitigating factors.

The portion of the charge defendant finds objectionable was given at the end of the portion of the charge explaining the functions of the aggravating and mitigating factors, how the balancing of those factors works, and how many verdict options the jury could choose from in its deliberations. The following excerpts from the charge make it clear that the jury was instructed that it need not be unanimous to find the existence of a mitigating factor or that the mitigating factors had to be equal to or outweigh the aggravating factors in order for defendant to avoid the death penalty. The charge stated:

As I stated earlier, unlike aggravating factors, *the law does not require unanimity with respect to the finding of a mitigating factor.* Obviously, you should all engage in a full and complete discussion regarding both aggravating and mitigating factors to the extent reasonably possible. *You should attempt to reach agreement on the question of whether a particular mitigating factor does or does not exist. However, the law does not require unanimity with respect to the finding of mitigating factors.* Rather, each of you must individually determine whether or not each mitigating factor exists and then weigh it, or them, mitigating factors that is, against the aggravating factors which have been unanimously found by all 12 jurors.

If after a full discussion you find that you are not unanimous on the existence or nonexistence of a mitigating factor, the foreperson will record your last vote on that question on the verdict form in the boxes which are shown there as number yes or no. *However, remember that whether a mitigating factor exists is not to be decided by the majority.* So for a vote on either one is 9 to 3, that doesn't mean it exists as a pure yes, it means nine say yes, three say no. That will be written in for the mitigating factors, number yes nine, number no three, if that's what the

final vote is and you have given a full and thorough discussion to it and attempted to reach agreement among yourself. If after a full and reasonable time of discussion you can't reach a unanimous agreement, then you just record the final vote on mitigating factors.

In the weighing process you will weigh the aggravating factors which have unanimously been found against the mitigating factors that each of you find. If you are not unanimous on the presence of an aggravating factor, then none of you may weigh that factor against the mitigating evidence. So with the aggravating factors, in order for that factor to be considered at all in the weighing process, it must be unanimously found to exist beyond a reasonable doubt by all 12 jurors. If not, it must be disregarded even if you as one individual juror believe that it has been proven. With respect to a mitigating factor, however, each of you considers whatever mitigating factors, factor or factors, if any, you find to exist and weigh and balance that against aggravating factors that have been proven, beyond a reasonable doubt, unanimously by all 12.

The court then explained to the jury the three verdict options in the following manner:

*If even one juror finds a mitigating factor which in that juror's mind is not outweighed beyond a reasonable doubt by the aggravating factor or factors, then the jury may not sentence the defendant to death.* A consequence of the jury finding the presence of one or more aggravating factors and no member of the jury finding the existence of a mitigating factor would mean that all members of the jury agree that the appropriate punishment is death.

If any of you find that the state has failed to prove that the *aggravating factor or factors outweigh the mitigating factors beyond a reasonable doubt* or if you cannot reach a unanimous verdict on the question of punishment, then the punishment shall be imprisonment for the defendant.

In an attempt to amplify the first option that the aggravating factors do not outweigh the mitigating, the trial court used the quoted language that defendant finds objectionable. That objectionable portion of the charge simply informed the jury that even if the jury unanimously agreed on the existence of one or more mitigating factors, and if one or more jurors found that one or more of the mitigating factors were equal to or outweighed the aggravating factor or factors, that result would be the same as if the jury had unanimously agreed that death is not the appropriate sentence. In other words, when the charge is considered as a whole, notwithstanding the fact that the jury was not required to be unanimous in finding mitigating factors, the effect on the ultimate verdict can be the same: No death penalty.

Based on our review of the jury charge as a whole, we find no basis to conclude that the jury was confused. In *State v. Loftin*, we observed that when a jury non-unanimously finds the existence of mitigating factors, that is "compelling evidence" that the jury was not confused on the permissibility of non-unanimity on mitigating factors. 146 *N.J.* 295, 376, 680 *A.*2d 677 (1996). In fact, the *Loftin* jury was non-unanimous on 19 of the 31 mitigating factors presented to them. We reaffirmed that principle in *Cooper, supra,* and concluded that defendant's claim lacked merit, considering the jury was non-unanimous on fourteen of the eighteen mitigating factors. 151 *N.J.* at 399, 700 *A.*2d 306.

In the present case, the jury also knew that non-unanimity on mitigating factors was permissible. The jury found 47 of the 126 mitigating factors non-unanimously. In addition, even assuming *arguendo* that this jury charge was confusing, the trial court explained to the jurors on several occasions, individually and as a group, that non-unanimity on mitigating factors was permissible.

Similarly, defendant's claim that the trial court erred when it stated that the mitigating factor or factors must be equal to or outweigh the aggravating factors also lacks merit. With regard to the aggravating and mitigating factors, there are only three possibilities: (1) the aggravating factors may outweigh the mitigating factors; (2) the factors may be equal; and (3) the mitigating factors may outweigh the aggravating factors. The first option results in a death verdict, while the other two result in a non-death verdict. There is no difference between telling the jury that a death verdict results only if they find the aggravating factors outweigh the mitigating factors and telling them that a non-death verdict results only if they find that the mitigating factors are equal or greater than the aggravating factors.

Based on the foregoing, we reject defendant's contention that his rights to a fair trial were violated when the trial court instructed the jury on mitigating factors.

## IX

### *Random Jury Selection Process*

Defendant claims that the trial court's refusal to grant a stay to consider whether Hunterdon County was employing a random jury selection process violated his constitutional right to be tried by a jury that represents a cross-section of the community. A defense expert testified that given the size of the population in Hunterdon County, the high incidence of members of the same family called for jury duty suggested an error in the attempt to randomly select the jurors. Defendant wanted the trial court to grant a stay to give him time to investigate whether the county's jury selection process was non-random.

*Rule* 1:8–3 provides that challenges to the jury array are to be initiated "before any individual juror is examined." Relaxation of the rule should be granted only where there is a *prima facie* showing of actual prejudice to defendant's right to a fair and impartial jury. *R.* 1:1–2; *State v. Butler,* 155 *N.J.Super.* 270, 271, 382 *A.2d* 696 (App.Div.1978). As a result, time limitations are "strictly enforced" because to do otherwise would "impede the orderly administration of [the] criminal justice system." *Gerald, supra,* 113 *N.J.* at 128, 549 *A.2d* 792.

In this case, pursuant to *Rule* 1:8–5, defense counsel was provided a list of the general panel of petit jurors in September 1996 for defendant's trial commencing in October. Due to defendant's guilty plea, the panel was dismissed and a new list was compiled. A new list of jurors was given to defense counsel in November 1996 for the penalty phase that commenced in December. Preliminary jury selection was conducted on December 11 and 12, 1996, but because there had been a substitution of counsel for defendant, trial was adjourned until early March 1997 so that defense counsel would have an opportunity to prepare to conduct individual juror *voir dire.* Over 300 jurors were interviewed during fourteen consecutive court days commencing March 3, 1997. Defendant's request for a stay was not filed until the very

last day of jury interviews, and the day before the final sixteen jurors were to be selected and the actual trial was scheduled to begin.

The request for a delay was properly denied for several reasons. First, the request was untimely. Defendant had several months to identify jurors with the same last names. By simply reviewing the list at any time between November and March, defendant would have had an "ample opportunity" to challenge the jury array before any individual juror was examined. *See State v. McClain*, 263 *N.J.Super.* 488, 497, 623 *A.*2d 280 (App.Div.), *certif. denied*, 134 *N.J.* 477, 634 *A.*2d 524 (1993). *See also R.* 1:8–2; *State v. Robinson*, 128 *N.J.Super.* 525, 529, 320 *A.*2d 533 (Law Div.1974) (denying challenge to grand jury array where defense counsel had "many months to investigate").

Second, defendant failed to make a "*prima facie* showing of actual prejudice." *Butler, supra*, 155 *N.J.Super.* at 271, 382 *A.*2d 696. The most defendant offered the court was the fact that five pairs of related jurors were discovered during questioning and that nine other pairs of jurors had the same last names. Defense counsel did not even know whether the latter group of jurors was related. However, even assuming *arguendo* that all fourteen pairs of jurors were related, defendant's claim that his right to an impartial jury was jeopardized was merely speculative. He presented no additional facts to prove prejudice.

Third, Hunterdon County is a small county. Considering the large number of jurors assembled for the false start in October and the even larger list of jurors assembled for the December start, coupled with the regular list of jurors assembled on a weekly basis and the need for jurors for another out-of-county capital case, there had been an enormous strain placed on the available prospective jury pool. As a result, the trial court properly was concerned that a third delay in the commencement of the trial would have had the "substantial capacity" to taint the already-questioned and ready-to-be-selected jurors.

Fourth, defendant did not contact any officials from Hunterdon County to register a complaint about the jury process. As the trial court stated:

> Whether it's the jury manager, county counsel, a representative of the assignment judge, county prosecutor's office, some appropriate official or authority ... would have a right to be notified and heard, since it is the procedures of the Hunterdon County jury manager's office and this vicinage ..., which are being challenged and called into question here.

Input from such officials is a necessary part of any hearing on the merits of such a motion.

Finally, this Court in *State v. Long* and in *Gerald* did not mandate a stay. In both cases, the Court found that despite the apparent problems in the jury selection procedures, in the absence of any purposeful or ill-intentioned deviations and no clear evidence of statutory or constitutional violations, there was no basis to strike either panel and reversals were not warranted. *State v. Long*, 119 *N.J.* 439, 470–71, 575 *A.*2d 435 (1990); *Gerald, supra*, 113 *N.J.* at 131, 549 *A.*2d 792.

Therefore, we find that the trial court properly denied defendant's request for a stay.

## X

### *Constitutionality of the Death–Penalty Statute*

Defendant claims that New Jersey's Death Penalty Act, *N.J.S.A.* 2C:11–3c to –3i, violates the Eighth Amendment. The basis for this claim is that the death-penalty statute fails to adequately "narrow and define the class of individuals eligible for death" and fails "to provide for a system of meaningful appellate review." Thus, defendant insists that his death sentence should be reduced to a term of imprisonment.

This Court has repeatedly rejected this claim and has upheld the constitutionality of the death-penalty statute. *Loftin, supra*, 146 *N.J.* at 333, 680 *A.*2d 677; *Martini I, supra*, 131 *N.J.* at 221–22, 619 *A.*2d 1208; *Ramseur, supra*, 106 *N.J.* at 185–97, 524 *A.*2d 188. Defendant has presented no persuasive reason for retreating

from that view. We, therefore, reaffirm our decisions upholding the constitutionality of the Death Penalty Act.

## XI

### *Customary International Law*

 Defendant contends that New Jersey's Death Penalty Act, *N.J.S.A.* 2C:11–3c to –3i, violates international customary law and should be invalidated. He maintains that there is a trend in international law toward the abolition of the death penalty. Defendant further contends that in recent years *N.J.S.A.* 2C:11–3c(6), the victim impact statute, and *N.J.S.A.* 2C:11–3i, a provision making conduct causing serious bodily injury resulting in death eligible for the death penalty, were expansions to the Death Penalty Act. According to defendant, those expansions resulted in a violation of customary international law. As a result, he insists that this violation requires a reversal of his sentence.

We disagree. The Court previously rejected this argument in *State v. Nelson* when we stated that "[i]nternational law does not require invalidation of New Jersey's death penalty." 155 *N.J.* 487, 512, 715 *A.*2d 281 (1998), *cert. denied,* —— *U.S.* ——, 119 *S.Ct.* 890, 142 *L.Ed.*2d 788 (1999). We reaffirm our decision finding that international law does not invalidate New Jersey's Death Penalty Act.

## XII

### *Cruel and Unusual Punishment and Proportionality Review*

 Defendant contends that a sentence of death constitutes a disproportionate and excessive punishment, violating the federal and state constitutional guarantees against cruel and unusual punishment. We adhere to our decision in *Ramseur, supra,* 106 *N.J.* at 190, 524 *A.*2d 188, in which we rejected arguments that the statute violated the Eighth Amendment of the United States Constitution or Article 1, paragraph 12 of the New Jersey Constitution. We, however, note and preserve defendant's challenge to

the proportionality of his death sentence and will conduct the proportionality review of his sentence, *N.J.S.A.* 2C:11–3e, in a separate proceeding.

## XIII

### *CONCLUSION*

We affirm defendant's convictions and capital and noncapital sentences. We grant defendant's request that this Court conduct proportionality review of his death sentence, and that he be allowed to make full argument at that time.

The State argues on cross-appeal that the trial judge erred in allowing into evidence a supplemental report summarizing an interview with a doctor and a lawyer regarding the conditions in the Pennsylvania prison isolation units where defendant spent six and one-half years of his twenty years in prison. That issue would be relevant only in the event of a new penalty trial. Because we are affirming defendant's convictions, we need not address that issue.

Affirmed.

O'HERN, J., concurring in Parts I, II, and IV–XII and dissenting in Parts III and XIII.

I concur in the opinion of the Court except with respect to Part III, in which the Court concludes that the trial court was not clearly erroneous in rejecting defendant's application to withdraw his guilty plea. By posing the wrong question, the Court has reached the wrong conclusion. The real question is whether the trial court should have accepted the plea in the first place.

## I

*Rule* 3:9–2 imposes a non-delegable duty on a court accepting a guilty plea to satisfy itself independently "that there is a factual basis for the plea and that *the plea is made voluntarily,* not as the result of any threats or of any promises or inducements not

disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea." (Emphasis added.) The federal counterpart, *Federal Rule of Criminal Procedure* 11, mirrors our rule's requirements for the acceptance of guilty pleas. Such rules have their genesis in the nature of a guilty plea. Chief Justice Warren has explained:

> A defendant who enters such a [guilty] plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. For this waiver to be valid under the Due Process Clause, it must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 *U.S.* 458, 464, 82 *L.Ed.* 1461, 1466 58 *S.Ct.* 1019 [,1023], 146 *A.L.R.* 357 (1938). Consequently, if a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void.
>
> [*McCarthy v. United States,* 394 *U.S.* 459, 466, 89 *S.Ct.* 1166, 1171, 22 *L.Ed.*2d 418, 425 (1969) (footnotes omitted).]

Our law is the same. "A guilty plea violates due process and is, thus, constitutionally defective if it is not voluntary and knowing." *State v. Barboza,* 115 *N.J.* 415, 421 n. 1, 558 *A.*2d 1303 (1989) (citing *McCarthy, supra,* 394 *U.S.* at 466, 89 *S.Ct.* at 1171, 22 *L.Ed.*2d at 425). A court's acceptance of a guilty plea is "explicitly contingent on the trial court's independent evaluation of voluntariness...." *State v. Ford,* 125 *Wash.*2d 919, 891 *P.*2d 712, 715 (1995).

Although the record discloses that the trial court engaged in a colloquy with defendant, the court did not discharge its independent obligation to assure that the plea was in fact voluntary. The record must "instill confidence" that a waiver of constitutional rights was voluntary. *United States v. Ready,* 82 *F.*3d 551, 558 (2d Cir.1996). Defendant Robert Simon was permitted to play a cat-and-mouse game with the court that undermined the court's independent obligation to determine if the plea was voluntary. The trial court "failed to put these matters to rest," and failed to "deal with these ambiguities" in Simon's answers. *People v. Jenkins,* 72 *A.D.*2d 876, 421 *N.Y.S.*2d 934, 935 (1979).

"Even if a defendant wishe[s] to plead guilty to a crime he or she did not commit, he or she may not do so." *State v. Smullen,*

118 *N.J.* 408, 415, 571 *A.*2d 1305 (1990). The most conclusive evidence bearing on the voluntariness of the plea appears in the transcript of the *in camera* hearing involving the court, the defendant, and his public defender attorneys. The defendant's attorneys had learned from co-counsel, not from Simon, that Simon intended to plead guilty on the first day of trial. Counsel for co-defendant Charles Staples had informed Simon's attorneys that, anticipating that Simon would plead, he did not expect to be in Burlington County for more than one day.

Simon and Staples were both members of the Warlocks motorcycle gang. Staples was the president of the South Jersey chapter. Staples had taken Simon under his wing when Simon was released from prison three months before the offense at issue.

Simon announced his decision to plead guilty after the intervention of gang members. Defense counsel asked the court not to accept Simon's plea. The court asked Simon whether, after he had telephoned the leader of the gang, "Was it something that has caused you to change your mind about pleading guilty?" Simon answered, "Of course it was," but added, "I'm not saying no more about it, Your Honor." Simon also stated that he did not want to plead guilty, but could not reveal why he was going to plead guilty anyway. When the court asked him to explain why he was giving up his right to trial by jury when he believed he might not be convicted of capital murder, Simon replied, "It's just something I got to do."

Such a record does not establish a voluntary plea to a capital crime. During the *in camera* proceedings, the defendant refused to state for the court what had made him plead guilty. The court had an independent obligation not to accept a plea that was on its face involuntary. That was not done because the court permitted Simon to withhold the underlying facts.

The majority finds it significant that when Simon made his later motion to withdraw the plea, he failed to prove that threats had been made sufficient to establish duress. *Ante* at 447, 737 *A.*2d at 17. Does that make an invalid plea valid? Of course not. Judge

Douglas Ginsburg of the District of Columbia Circuit Court of Appeals has set forth the correct analysis of a motion to withdraw a guilty plea—look first at the plea itself. If the plea taken did not conform to the rule, the plea must be vacated.

> [W]e will likely achieve greater economy and perhaps also clarity if we begin our analysis in such cases by assessing whether the defendant's plea was taken in compliance with *Rule* 11. If we determine that there was no error in the taking of the defendant's plea, we will be extremely reluctant to reverse the district court, even if the defendant makes out a legally cognizable defense to the charges against him. That is, a defendant who fails to show some error under *Rule* 11 has to shoulder an extremely heavy burden if he is ultimately to prevail.

> This more structured inquiry—focusing first on the most important, indeed, the determinative factor in all our decisions to date—will both conserve the resources of the bench and provide better guidance to the bar, and we adopt it today as the presumptive framework for analyzing a district court's denial of a presentence motion to withdraw a guilty plea under *Rule* 32(d). It will conserve resources because the court will not need exhaustively to examine all three issues in every case. As a result, our decisions will inform the bar of what is required to make out each element on appeal, without confusing matters by implying that there are simple trade-offs to be made among them. This sequential inquiry will properly focus the efforts of defense counsel and the Government upon the key issue raised by the appeal of an order denying a motion to withdraw a guilty plea: Has a defendant knowingly and voluntarily waived his right to meet the charges brought against him?

> [*United States v. Cray,* 47 *F.*3d 1203, 1208 (D.C.Cir.1995).]

There is lingering resentment—and justifiably so—that defendant was playing games with the court and hoodwinked the State into trying Staples first. The problem is that we do not execute people because they play games. Because we respect life, we do not permit anyone, prosecution or defense, to inject the irrational into the capital-sentencing process. "The death penalty is unique, in result and in procedure." *State v. Kiett,* 121 *N.J.* 483, 499, 582 *A.*2d 630 (1990); *see also State v. Koedatich,* 112 *N.J.* 225, 329–30, 548 *A.*2d 939 (1988) (holding that defendant in capital case may not waive right to present mitigating evidence during penalty phase), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), *appeal after remand,* 118 *N.J.* 513, 572 *A.*2d 622 (1990). On its face, Simon's plea did not comply with *Rule* 3:9–2. The

"unique" procedures applicable to death penalty cases do not allow for an exception.[1]

## II

The totality of the information before the court at the time of Simon's plea required a rejection of the plea. Contrary to the Court's treatment of this issue as involving a review of an exercise of discretion, our jurisdiction in this respect is plenary. *State v. Perez*, 122 *Idaho* 1, 830 *P.*2d 1, 2 (App.1992); *LoConte v. Dugger*, 847 *F.*2d 745, 750 (11th Cir.), *cert. denied*, 488 *U.S.* 958, 109 *S.Ct.* 397, 102 *L.Ed.*2d 386 (1988). The record failed to describe the underlying facts that led to Simon's plea. Among the factors relied upon by defendant to show that the totality of the information before the trial court was counter indicative of voluntariness are the facts that follow.

Simon decided to plead guilty to the murder indictment on the same day that jury selection was scheduled to begin in the joint-capital murder trial of Simon and Staples. On the preceding Friday, October 4, 1996, the local and national presidents of the Warlocks had appeared in court. That same day, Staples passed on to Simon a slip of paper containing the telephone number of the local president of the Warlocks. On Saturday, October 5, a local newspaper reported that members of the Warlocks were pressing Simon to plead guilty. On Monday, October 7, Simon announced

---

[1] We do allow an exception that a defendant in a capital case need not provide a factual basis for a plea. *Rule* 3:9–2 states in part:

When the defendant is charged with a crime punishable by death, no factual basis *shall be required from the defendant before entry of a plea* of guilty to a capital offense or to a lesser included offense, provided the court is satisfied from the proofs presented that there is a factual basis for the plea. "The rationale for this singular exception is that a defendant exposed to the death penalty should not be required to state anything that can support an aggravating factor; he need not aid in rendering his own death sentence." *State v. DiFrisco*, 118 *N.J.* 253, 285, 571 *A.*2d 914 (1990) (Handler, J., concurring in part and dissenting in part) (citing Comment, Supreme Court Committee on Criminal Procedure, reprinted in Pressler, *Rules Governing the Courts of the State of New Jersey*, 533 (1989)).

his intention to plead guilty. Counsel urged Simon to delay entry of the plea until they could appeal to this Court on the issue of severing Simon's trial from Staples's trial. Counsel told the court that Simon answered, "what good would it do. It wouldn't make any difference. I'd be in prison and get a shiv in the back. . . ." At the colloquy between the court and Simon, the following exchanged occurred:

> THE COURT: What is this thing about the shiv in the back? You said it was out of context.
>
> SIMON: I was making a comment to him [counsel] that if—if I'm wrong, tell the Judge. I said, like I could go to court and we could beat this whole thing or do whatever we're going to do and then two minutes after I walk out of the courtroom and I'm back in prison somebody could stab me in the back. That's the way life is.
>
> You know, it wasn't like somebody was threatening me that they were going to stab me in the back. I love threats, your Honor. I'm telling you the truth. I love them cause then I know some a's going to try something. That's the type of person to threaten somebody.
>
> . . . .
>
> THE COURT: Did you say to your attorneys that you didn't know about it [that he would plead guilty] until Friday yourself?
>
> SIMON: That's right.
>
> THE COURT: What did that mean?
>
> SIMON: I can't tell you. Really, if it means anything to you or to them, but I just can't tell you.
>
> THE COURT: Did someone inform you about something between Thursday and Friday [October 3 and 4] that you didn't know Thursday, that you did learn of and, therefore, know about on Friday?
>
> SIMON: Something like that. I mean, you can talk all around it and all day long. I'm not telling you what happened and, like, it's nothing where it's a threat toward me or anybody I know.

Simon believed that he could defeat the capital aspect of the case and offered no reason for risking his life by pleading to capital murder. The colloquy continued:

> THE COURT: Did you tell your attorneys, as they reported to me, that you recognize, that you believe them, that they have a fair shot, whether they said a good shot or real good shot, pretty good shot, but some reasonable shot at avoiding a death penalty phase, because—
>
> SIMON: I told them that.

THE COURT: Because they think that it would be hard for the prosecutor to convince all twelve jurors beyond a reasonable doubt that you were the trigger man.

SIMON: I told them that.

THE COURT: Do you feel that way? Was that something that was the truth when you told them that, that you do really believe that?

SIMON: I believe that if we went to court I'd have a shot at not even getting a death penalty, but I don't care. Like I said, I don't care. I mean, like I don't want to spend the rest of my life in prison. Okay? So, like if I get the death penalty, I get it. Who cares? I don't care.

THE COURT: So, your reason for giving up the shot that you have, which you acknowledge is at least a reasonable shot at not having to face the death penalty, is you just don't care?

SIMON: I don't care.

Simon received no legal benefit in exchange for the plea. The only benefit of the plea was to Staples:

THE COURT: [I]s it your expressed desire to plead guilty, does it have to do with exonerating Staples from having to face the possibility of a death sentence on his part?

SIMON: That could help, but don't use that against me. You know, I'd like to help Staples. I would. I can't see, like I said in the beginning, I can't see the both of us going down the tubes. No reason for that.

. . . .

THE COURT: What do you think would happen if I didn't accept your plea of guilty? What if you tried to put it through and I just reject it? What do you think would happen?

SIMON: I don't know. I have no idea. I want to take some of the burden off of Shovel's [Staples's] family. You know, I think that would help them out cause they're going to put—have to put out a whole bunch of money to this clown that's representing Shovel.

THE COURT: Is that because—you tell me in your own mind why do you want to take this burden off Shovel and his family?

SIMON: Cause I think that would be the right thing to do.

THE COURT: Are you under any pressure from anyone else to do that?

SIMON: Not at all.

THE COURT: Either through Shovel or his family?

SIMON: No. I'm trying to be a nice guy here. Maybe that's the last good gesture I'll be able to do in my life, you know.[2]

---

2 Even the prosecutor had difficulty believing that defendant was acting out of genuine concern for Staples. He later said: "Mr. Simon has a very unsavory

Simon's lawyers believed that Simon was entering the plea under duress and urged the court not to accept the plea. They also requested that the court seal the proceedings to protect Simon and asked to be removed as counsel so that they could testify without a conflict of interest, should their replacement counsel find it necessary to offer their testimony at a future date. The court refused to remove them as counsel and took no testimony other than during the *in camera* hearing.

Finally, Simon himself indicated that he did not want to plead but had to plead and expressly told the court that he could not reveal his reason for doing so.

> THE COURT: Was it something that has caused you to change your mind about pleading guilty?
>
> SIMON: Of course it was. I did it.
>
> THE COURT: Does it have something to do with Mr. Staples and his—whatever his outcome in this case might be?
>
> SIMON: I told you, I'm not saying no more about it, your Honor. It was something personal and I can take care of whatever it is. I give you my word it's nothing where I was threatened or I'm worried about anything. It's just the way—it's the way I'm going to do things.

At the in-court hearing on the plea, it was the court's suggestions to defendant that furnished the reasons for the plea. Defendant was smart enough to realize that the court would accept the plea if he repeated the language suggested by the court. After defense counsel identified legal inconsistencies between Simon's account and the elements of capital murder, the court subjected Simon to further questioning. Simon eventually stated that he had fired the gun with the intention of hitting the officer. Defense counsel then stated that "the forensics of this case are essentially inconsistent with the recitation that Mr. Simon just rendered to this court."

Recall that the deceased officer, Sergeant Ippolito Gonzales, was found with Simon's social security card and Staples's driver's

---

criminal background and it's perhaps uncomfortable to conclude that he would do something noble for a friend and colleague, but it's not impossible."

license under his leg with a bullet hole through them. The automobile insurance and registration cards were found in the vehicle with a bullet hole through them. A forensic expert testified that one of the two shots was fired at a distance of perhaps twenty inches from the insurance card. There was evidence of "gun powder grains found on the insurance card of Mr. Staples, that was apparently in the hand of the police officer" when he was shot. Officer Kenneth Crescitelli, Sergeant William Clay, and a neighbor, John Lyman, all observed Officer Gonzalez talking to the driver at different times during the stop. No one saw the officer talking to the passenger.

Simon testified that he was sitting on the passenger side of the car and had just stepped out of the car when he saw the officer reaching for his gun. Simon told the court, "I got out with the intent of trying to talk to him and I started to say something and as I did he started to go for his gun, so then I went for mine." Simon testified that he fired two shots at a distance of about six feet from Sergeant Gonzalez. When pressed by the court, Simon answered, "He was about six foot from my body. Maybe when I held the gun out he might have been three foot from that."

Because defense counsel was unwilling to help Simon further "improve" his plea, counsel declined the court's offer to be more specific about his objections:

> Well, I don't intend to do that, your Honor, for this reason. We believe that this is a coerced plea and I believe that as soon as I begin to do that Mr. Simon will then answer your Honor's questions consistent with what he needs to get this plea through, just as when I explained to the court why ... the expert evaluation of the distance of the shooting [was inconsistent with defendant's statement] ... and then Mr. Simon said, well, it was six feet, but maybe it was a little closer. I'm not going to set him up for that.

I realize that it is difficult for society to accept that those who stand to be convicted of the shocking and heinous crime of killing a police officer should expect society to afford them the benefit of its laws. Society will not understand why we should insist that there be a "textbook ... inquiry", *Cray, supra,* 47 *F.*3d at 1208, as to whether Simon's plea was voluntary. He himself said, "So, like if I get the death penalty, I get it. Who cares? I don't care."

Why should we care if he did not care? We can only recall what Justice Handler said on another occasion: "Although perhaps unwittingly, in failing to insist that death be imposed with the full measure of constitutional protection or not at all, we lose a significant and irredeemable part of our civilization built on the rule of law." *State v. Bey (Bey IV)*, 137 *N.J.* 334, 430, 645 *A.2d* 685 (1994) (Handler, J., dissenting), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.2d* 1093 (1995).

A 1997 report of the Death Penalty Information Center stated that sixty-nine wrongful capital convictions have been documented in the United States since 1976. David E. Rovella, *Illinois Expands Right to DNA Testing: Seven Men's Release From Death Row in Three Years Spurs Bipartisan Support, Nat'l L. J.*, Aug. 11, 1997, at A6. Thus far in the administration of the death penalty, New Jersey has been spared the error of sentencing the wrong person to death. This is no doubt due to commitment by our system of criminal justice—the judiciary, the bar and law enforcement officials—to the observance "of those indispensable safeguards for the ascertainment of guilt." *State v. Harris*, 156 *N.J.* 122, 201, 716 *A.2d* 458 (1998). Among those indispensable safeguards for the ascertainment of guilt is the responsibility in a capital case to insure that a plea is voluntary. The record in this case failed to meet that requirement.

Simon, in effect, said to the court, "My plea is voluntary, Your Honor, but I have to do it." That is like saying to the court, "I want to plead guilty to the crime, Your Honor, but I did not do it." No court may accept such a plea.

HANDLER and STEIN, JJ., join in this opinion.

HANDLER, J., dissenting.

I dissent for the reasons expressed in the opinions of Justices O'Hern and Stein.[1] Accordingly, I, too, believe that defendant's

---

[1] I concur in the opinion of Justice Stein, notwithstanding my position that the *non vult* plea at issue in *State v. Ramseur*, 106 *N.J.* 123, 524 *A.2d* 188 (1987), did

death sentence should be vacated. I write separately to address concerns related to the Court's review of the adequacy of defendant's plea. The enhanced protections constitutionally required in capital prosecutions demand that the adequacy of guilty pleas to capital murder be reviewed with particular rigor and care, by standards pursuant to which the plea in this case would certainly have been rejected. Such precautions should follow evidently from the importance law and society place upon avoiding wrongful convictions and, especially, executions. The Court's failure to require a more exacting standard of review coupled with its failure to reject the plea in the present case is, moreover, reflective and indeed an active component of a more invidious and wide-ranging development: Death penalty jurisprudence is weakening the constitutional protections of general criminal law.

I

A.

Defendant's death sentence must be vacated because the record does not establish that defendant's plea of guilty to capital murder was voluntary. *Ante* at 488–94, 737 *A.*2d at 40–43 (O'Hern, J., dissenting in part and concurring in part). As Justice O'Hern points out, the record contains substantial evidence that defendant pled under duress from coercive external pressures. *See id.* at 487, 737 *A.*2d at 39 (O'Hern, J., dissenting in part and concurring in part). The record sufficiently presents the possibility that defendant's admissions to the factual circumstances of the crime, which were evoked, notably, by the plea court's leading inquiry,

---

not satisfy the prior murder conviction aggravating factor under *N.J.S.A.* 2C:11–3c(4)(a). *See Ramseur, supra,* 106 *N.J.* at 436–43, 524 *A.*2d 188 (Handler, J, dissenting). Accordingly, rather than distinguish the *non vult* plea in *Ramseur* as a clear-cut conviction for first-degree murder, *see ante* at 507–09, 737 *A.*2d at 51–52 (Stein, J., dissenting), I would argue that the ambiguity underlying Simon's Pennsylvania murder conviction is synonymous with the uncertainty that was attendant to Ramseur's *non vult* plea under the repealed New Jersey murder statute.

see id. at 491–92, 737 A.2d at 42 (O'Hern, J., dissenting in part and concurring in part) (noting that "it was the court's suggestions to defendant that furnished the reasons for the plea"), were lies. Consequently, Simon's plea was unacceptable. *See Boykin v. Alabama*, 395 *U.S.* 238, 242, 89 *S.Ct.* 1709, 1711–12, 23 *L.Ed.*2d 274, 279 (1969) (holding that guilty plea is invalid unless defendant makes affirmative showing on record that plea is knowing and voluntary); *State v. Howard*, 110 *N.J.* 113, 122, 539 *A.2d* 1203 (1988) (same); *see also R.* 3:9–2 (requiring that court not accept guilty plea without first determining "that there is a factual basis for the plea and that the plea is made voluntarily, not as the result of any threats or of any promises or inducements not disclosed on the record, and with an understanding of the nature of the charge and the consequences of the plea"). The plea was, plainly, of the sort that "[n]o court may accept," in any criminal proceeding. *Ante* at 494, 737 *A.2d* at 44 (O'Hern, J., dissenting in part and concurring in part); *see State v. Smullen*, 118 *N.J.* 408, 415, 571 *A.2d* 1305 (1990) ("Even if a defendant wished to plead guilty to a crime he or she did not commit, he or she may not do so.").

The insufficiency of the plea in this case is particularly egregious because Simon pled guilty to capital murder. It is aphoristic that enhanced constitutional protections are required in capital prosecutions. *See, e.g., Woodson v. North Carolina*, 428 *U.S.* 280, 305, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976). The protections due capital defendants under the New Jersey Constitution may exceed those of the federal Constitution. *See Ramseur, supra*, 106 *N.J.* at 190, 524 *A.2d* 188 (interpreting *N.J. Const.* art. I, ¶ 12); *id.* at 369–82, 524 *A.2d* 188 (Handler, J., dissenting) (interpreting *N.J. Const.* art. I, ¶¶ 1, 5, and 12). I continue to believe that courts must apply exacting inquiry, and appellate courts scrupulous review, before accepting a plea of guilty to a capital crime. *Accord State v. DiFrisco*, 118 *N.J.* 253, 284–89, 571 *A.2d* 914 (1990) (Handler, J., concurring in part and dissenting in part); *State v. Davis*, 116 *N.J.* 341, 383–90, 561 *A.2d* 1082 (1989) (Handler, J., dissenting in part and concurring in part). The

Court has previously recognized that because capital punishment is "unique," special care must be taken in capital cases to insure that the defendant pleading understands the nature of the charges and consequences of the plea. *See State v. Kiett,* 121 *N.J.* 483, 495–96, 499, 582 *A.*2d 630 (1990) (allowing defendant to withdraw plea where guilty plea was entered in reliance on misinformation that by doing so he would avoid the death penalty, for which he was not in fact eligible); *see Davis, supra,* 116 *N.J.* at 374, 561 *A.*2d 1082 (reversing death sentence and guilty plea to capital murder where defendant was not adequately informed of the then-pertinent *Gerald* distinction between capital and non-capital murder); *accord id.* at 383–84, 561 *A.*2d 1082 (Handler, J., dissenting in part and concurring in part) (explaining how "standards by which a defendant is informed of the nature and consequences of a guilty plea must be more meticulously defined and scrupulously applied"). I would add that special precautions must be applied in assessing the factual basis of pleas to capital murder. *Davis, supra,* 116 *N.J.* at 385–87, 561 *A.*2d 1082 (Handler, J., dissenting in part and concurring in part). Further, before a guilty plea to capital murder can be accepted, "the court should also require the State to demonstrate the evidence available to prove aggravating factors." *Id.* at 389, 561 *A.*2d 1082 (Handler, J., dissenting in part and concurring in part).

The circumstantial evidence of coercion in this case, *see ante* at 488–94, 737 *A.*2d at 40–43 (O'Hern, J., dissenting in part and concurring in part), when viewed in a light consistent with the Court's conception of enhanced constitutional protections for capital defendants, resolves the issue unquestionably in defendant's favor. The Court, however, makes no special mention of the fact that Simon pled guilty to capital murder; it assesses the validity of defendant's guilty plea according to the standards applicable to criminal offenses generally. *See ante* at 444–45, 737 *A.*2d at 15–16. Consequently, the Court's conclusion that "defendant's plea was made voluntarily," *id.* at 446, 737 *A.*2d at 16, is all the more unsound and untenable. The plea record reflects the distinct and realistic possibility that Simon's plea was made subject to coercive

influence from a source and circumstances external to the adjudicative forum. If that form of involuntariness were to appear in an ordinary criminal case, it should give a court long pause before accepting such a plea. In a capital case, the acceptance of a plea that is the result of external coercion is manifestly unsatisfactory.

## B.

The potential injustice in this case is compounded by the fact that the lack of voluntariness of defendant's plea affected the factual basis established for the plea. The evidence in the record was equivocal with regard to who shot the victim. *See id.* at 434–35, 737 *A.*2d at 10 ("Because the State did not know whether defendant or Staples was the trigger-person who killed Sergeant Gonzalez, it decided to charge both of them with purposeful and knowing murder by his own conduct and require the jury to determine which one actually was the killer."). Because it was not clear that Simon desired to plead guilty independently of reasons externally imposed, we must entertain the possibility that defendant was innocent of capital murder. *See ante* at 494, 737 *A.*2d at 44 (O'Hern, J., dissenting in part and concurring in part) (suggesting that Simon's plea was, in effect, "I want to plead guilty to the crime . . . but I did not do it").

Wrongful convictions are recognized to be more likely in cases settled by guilty pleas than in cases adjudicated by trial. *See, e.g.,* William S. Laufer, *The Rhetoric of Innocence,* 70 *Wash. L.Rev.* 329, 359 (1995) ("Plea bargain contracts increase the likelihood of convicting innocents as compared with fully adjudicated cases that are decided after testimony of witnesses to the particular event has been heard and all of the truth-checking devices of a vigorous adversary procedure have been used.") (footnote omitted); Stephen J. Schulhofer, *Plea Bargaining as Disaster,* 101 *Yale L.J.* 1979 (1992) ("[P]lea bargaining seriously impairs the public interest in effective punishment of crime and in accurate separation of the guilty from the innocent."). It is also recognized that wrong-

ful convictions are prevalent in capital prosecutions, sometimes as the result of guilty pleas. *See, e.g.,* Michael Radelet et al., *In Spite of Innocence* (1992) (listing cases of innocent defendants who were wrongfully convicted).

In a capital case, wrongful conviction is not the only risk associated with a defendant's coerced plea—so is the execution of an innocent person. The execution of innocent people is a prospect that even the strongest proponents of capital punishment cannot abide. *See* Samuel R. Gross, *The Risks of Death: Why Erroneous Convictions are Common in Capital Cases,* 44 *Buff. L.Rev.* 469, 471–72 (1996). The execution of defendants guilty of murder, but not capital murder and not eligible for capital punishment, is equally intolerable; insofar as society accepts the death penalty, it is reserved as punishment only for a few, especially egregious crimes. As Justice O'Hern points out, the possibility of executing an innocent person is attendant to coerced pleas, and we have been fortunate thus far, perhaps due to our recognition of the heightened safeguards needed in capital cases, to have avoided such a disaster. *See ante* at 493–94, 737 A.2d at 43–44 (O'Hern, J., dissenting in part and concurring in part). The fact that this case presents that very possibility provides all the more reason why defendant's questionable plea should have been rejected.

## II

Failing to find what would plainly be involuntariness in any case and ignoring the risk that the defendant to be executed has not committed capital murder, the Court has, rather than vigilantly protecting the rights of this capital defendant, diluted his constitutional protections. The damage done by the Court's opinion, however, goes beyond manifest injustice to Simon. The Court's decision adds another incremental layer to a body of death penalty precedent that reflects not the evolutionary enhancement but the gradual diminishment of protections for capital defendants. More alarmingly, the Court's opinion has the prepotency to soften the general standards that provide a protective bulwark for all citizens

charged under our criminal law. Because this is a capital case, the Court's opinion becomes tempting precedent; it can easily be marshalled as authority in an ordinary criminal case to justify the conviction of a non-capital defendant. The Court's decision then not only weakens the standards needed to protect defendants in capital cases, it erodes the fundamental protections long accepted as a basic part of our criminal law.

The problem begins when the Court, as here, subscribes to a single standard generally applicable in all criminal cases, that it aims to apply more scrupulously in capital cases, but then gives at most token deference to enhanced protection for capital defendants. Even in certain other capital prosecution contexts, where the Court adopts a different and stricter legal standard, it may apply the standard in a lax manner. Quite often, it seems, we state the principles of enhanced protection in capital cases and then operate inversely; that is, actually to provide capital defendants with less protection. Indeed, we may be prone to this course, even though we are consciously opposed to it. *See, e.g., id.* at 488, 737 *A.*2d at 40 (O'Hern, J., dissenting in part and concurring in part) ("On its face, Simon's plea did not comply with *Rule* 3:9–2. The 'unique' procedures applicable to death penalty cases do not allow for an exception.") (footnote omitted).

One of the dangers of begrudging application of constitutional safeguards in capital cases is the creation of precedent that by example becomes the measure of protection for the Court in its review of future capital cases. For example, in *State v. Koedatich,* 112 *N.J.* 225, 325, 548 *A.*2d 939 (1988), the Court upheld the defendant's conviction, despite flagrant prosecutorial misconduct. I dissented, pointing out that the Court failed to apply the particularly rigorous review of prosecutorial misconduct we recognize to be necessary in capital cases. *Id.* at 368, 548 *A.*2d 939 (Handler, J., dissenting) (citing *Ramseur, supra,* 106 *N.J.* at 324, 524 *A.*2d 188); *accord id.* at 341–42, 548 *A.*2d 939 (Clifford, J., dissenting). The misconduct alleged in *Koedatich, supra,* now pales in comparison to that upheld in the Court's recent decision

in *State v. Timmendequas,* 161 *N.J.* 515, 570–93, 737 *A.*2d 55, 84–97 (1999), in which the Court implicitly approves of the *Koedatich* holding, *see id.* at 571, 737 *A.*2d at 84 (citing *Koedatich, supra,* 112 *N.J.* at 320–25, 548 *A.*2d 939, for proposition that prosecutorial misconduct is not reversible error unless it deprived defendant of fair guilt-phase trial).

This Court's treatment of pretrial publicity beginning with *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987), follows a similar pattern. Earlier, in *State v. Williams,* 93 *N.J.* 39, 63, 459 *A.*2d 641 (1983), the Court enunciated a heightened standard to protect a defendant's right to an impartial jury in the face of pretrial publicity by allowing a change of venue where there was a 'realistic likelihood' of prejudice. The Court directed that in capital cases, such as Williams's, "trial courts must exercise special caution." *Id.* at 65, 459 *A.*2d 641. In *Biegenwald, supra,* the Court professed to prescribe rigorous standards for dealing with the inflammatory publicity that preceded the defendant's capital trial; yet, despite prejudicial pretrial publicity, it affirmed the denial of the defendant's motion for a change of venue, finding that the court's voir dire preserved defendant's right to an impartial jury. 106 *N.J.* at 37, 524 *A.*2d 130. I protested the dilution of the heightened standard enunciated in *Williams, supra. See Biegenwald, supra,* 106 *N.J.* at 88, 524 *A.*2d 130 (Handler, J., dissenting). In *Koedatich, supra,* 112 N.J. at 282, 548 A.2d 939, the Court echoed its holding in *Biegenwald,* under extreme circumstances. I observed that "[t]o the extent that the Court's review is influenced by the fact that this is a capital case, that influence seems to have lessened the scrutiny of the record below." *Id.* at 363, 548 *A.*2d 939 (Handler, J., dissenting). Since then, in even more outrageous conditions, the Court has further enfeebled the standard. *See State v. Harris,* 156 *N.J.* 122, 141–57, 716 *A.*2d 458 (1998); *see also id.* at 212–31, 716 *A.*2d 458 (Handler, J., dissenting) (examining extent and effect of pretrial publicity). *Timmendequas, supra,* in which the Court allowed the empanelment of a jury on which a preponderance of the jurors knew of the

accused sex offender's inadmissible prior sex conviction, exemplifies the Court's substantial retreat from the Court's prior attempts to protect capital defendants from the prejudicial effects of pretrial publicity. *See* 161 *N.J.* at 722, 737 *A.*2d at 172 (Handler, J., dissenting).

If token deference to enhanced protections for capital defendants has such a weakening effect on this Court's capital jurisprudence, one must be concerned with the effect those decisions may have upon general criminal legal standards in our justice system. Death penalty cases, because they are assumed to be exemplars of fair prosecutions, are frequently cited as authority to sustain criminal convictions; as such, they filter back into and influence the general criminal law. In an ordinary criminal case, in which a non-capital defendant alleges like circumstances as the basis for protectable rights, the court may look to the similar capital precedent as an example of the appropriate, presumably heightened, standard to be followed. The court, assuming the standard for its non-capital case to be less rigorous than the capital precedent, could understandably feel no compunction in following that precedent, even if by application in the capital case the standard was weakened. It is not easy to identify and gauge this effect. When the prevalence of cases cited for a proposition are capital, however, and those cases are most often cited as authority for affirming convictions, that suggests capital jurisprudence is coloring the discretion being exercised by criminal trial courts. In sum, by failing to apply enhanced standards of protection for capital defendants while professing to do so, the Court creates a climate in which trial courts are more likely to apply reduced standards of protection in all criminal cases.

Such is the stature of the Court's application of the standard requiring knowing and voluntary guilty pleas to Simon's case. The Court's indolent application of the standard for voluntary and knowing pleas in this capital case begets a legacy that will be inherited by other criminal defendants.

I, therefore, dissent.

STEIN, J., dissenting.

Simply stated, a critical issue posed by this capital appeal is whether a defendant's second-degree murder conviction in Pennsylvania, following a jury charge that permitted a finding of malice on the basis of a mental state equivalent to that required for aggravated manslaughter under New Jersey's Code of Criminal Justice, can qualify as a prior murder and serve as an aggravating factor under New Jersey's Death Penalty Act. Remarkably, the Court concludes that the Legislature "intended to make any prior murder committed by a defendant at any time and at any place an aggravating factor." *Ante* at 457, 737 *A.2d* at 22–23. That conclusion cannot be sustained because it would permit the definition of murder adopted by other states, rather than New Jersey's definition of murder, to determine whether a defendant is eligible for the death penalty.

*N.J.S.A.* 2C:11–3c(4)(a) allowed the jury to consider, as an aggravating factor weighing on defendant's death-worthiness, its finding that "[t]he defendant ha[d] been convicted, at any time, of another murder." In this appeal defendant challenges the admissibility of a foreign murder conviction as an aggravating factor in a capital penalty proceeding. In addition, defendant contends that as a prerequisite to the admission of a prior murder conviction from another state, the prosecution must establish that the foreign jurisdiction's definition of murder at the time of defendant's prior conviction comported substantially with the offense of murder as defined by *N.J.S.A.* 2C:11–3.

Although I agree with the majority's holding that *N.J.S.A.* 2C:11–3c(4)(a) contemplates the admissibility as a statutory aggravating factor of a murder conviction entered "at any place" as well as "at any time," I cannot endorse the majority's view that a foreign conviction for murder, no matter how defined, is admissible in a capital penalty phase. Under the majority's holding, a defendant's death-worthiness may depend on whether that defendant's prior homicide was committed in this State, or in a foreign jurisdiction that chooses to define "murder" as including conduct

that would support no more than a conviction for the lesser offense of aggravated manslaughter in New Jersey. To allow a jury to impose a death sentence based on a foreign conviction for "murder" when that murder, as defined by the foreign jurisdiction, would not qualify as a statutory aggravating factor in this State would inject an arbitrariness into our death-penalty jurisprudence that this Court has heretofore been unwilling to tolerate.

Because I believe that the majority's holding wrongly expands the category of death-eligible defendants and undermines the Legislature's explicitly stated intention to strictly limit death eligibility to the circumstances enumerated under *N.J.S.A.* 2C:11–3, I dissent.

## I

In deciding a defendant's death-worthiness, *N.J.S.A.* 2C:11–3c(4)(a) allows a jury to consider as an aggravating factor a defendant's prior conviction, "at any time, of another murder." Pursuant to the statute, the jury in this case found that defendant's 1984 Pennsylvania conviction for second-degree murder constituted an aggravating factor. Whether the offense for which defendant was convicted in 1984 would qualify as a prior "murder" if committed in this State requires an examination of the New Jersey statutes as well as the law of Pennsylvania, as that law was charged to the jury in defendant's 1984 trial.

*N.J.S.A.* 2C:11–3a provides that criminal homicide constitutes "murder" when the actor purposely or knowingly causes death or serious bodily injury resulting in death, or when the homicide is committed when the actor is engaged in the commission of certain enumerated felony offenses. Because defendant's prior homicide did not involve the commission of a felony, in my view the question in this case is whether he was convicted of "purposely or knowingly caus[ing] death or serious bodily injury resulting in death."

In defendant's 1984 Pennsylvania trial, the court instructed the jury that "Robert Simon is charged with Criminal Homicide; that is—with the taking of the life of Beth Smith without lawful

justification or excuse." The court charged the jury that the Commonwealth of Pennsylvania, at that time, recognized three types of homicide: murder in the first degree, murder in the second degree, and voluntary manslaughter. Each category of homicide required the jury to find that defendant had caused the victim's death; therefore the crimes were distinguishable on the basis of defendant's mental state. First-degree murder required the jury to find that defendant had a specific intent to kill. A conviction for either first- or second-degree murder, the court charged the jury, required the jury to find that the killing was committed with malice. Malice, the court explained,

> is a short-hand way of referring to any of the various bad mental states or attitudes which a person who kills must have for the killing to be Murder.
>
> A killing is with malice and is, therefore, Murder if the killer acted with one of the following states of mind: an intent to kill, or an intent to inflict serious bodily injury, *or a wickedness of disposition, hardness of heart, cruelty, recklessness, disregard of the consequences, and a mind regardless of social duty, indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life.* That's what we mean by malice.
>
> On the other hand, a killing is without malice if the killer acted with lawful justification or excuse, or under circumstance reducing the killing to Voluntary Manslaughter.

[Emphasis added.]

The court instructed the jury that because the definition of malice encompasses an intentional homicide, a finding that defendant intended to kill the victim would also satisfy the malice element, resulting in a conviction for first-degree murder. A conviction for second-degree murder, on the other hand, would result if the jury found either of the remaining two mental states included within the broad definition of malice: intent to cause serious bodily injury; or "a wickedness of disposition, hardness of heart, cruelty, recklessness, disregard of the consequences, and a mind regardless of social duty, indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life."

## II

As defendant has argued, the problem in this case arises because it is impossible to know which of the two possible mental states for second-degree murder, included within the court's definition of malice, the jury found that he possessed at the time of the Pennsylvania homicide. If the jury's verdict was based on a conclusion that defendant intended to cause the victim serious bodily injury, defendant's Pennsylvania conviction clearly would have been admissible as a prior "murder" conviction. See *N.J.S.A.* 2C:11–3a(1) and (2) (defining as murder an actor's purposely or knowingly causing serious bodily injury resulting in death). If, however, the jury found defendant guilty of second-degree "murder" based on a finding that defendant acted with "a wickedness of disposition, hardness of heart, cruelty, recklessness, disregard of the consequences, and a mind regardless of social duty, indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life," then defendant's conviction parallels the crime of aggravated manslaughter under New Jersey law. See *N.J.S.A.* 2C:11–4 (defining as aggravated manslaughter an actor's recklessly causing death under circumstances manifesting extreme indifference to human life). A prior conviction for aggravated manslaughter does not qualify as a prior murder conviction under *N.J.S.A.* 2C:11–3c(4)(a). See *State v. Bey,* 137 *N.J.* 334, 387–88, 645 *A.2d* 685 (1994) (noting that guilty plea to manslaughter cannot be asserted by prosecutor as prior-murder-conviction aggravating factor), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.2d* 1093 (1995).

Contrary to the majority's implication, a Pennsylvania second-degree murder conviction under the "wickedness of disposition, hardness of heart" formulation of malice unquestionably is the equivalent of aggravated manslaughter as defined by the New Jersey statutes. In this State, "[c]riminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human

life." *N.J.S.A.* 2C:11–4a. Aggravated manslaughter is identical to the lesser-included offense of reckless manslaughter except for the difference in the degree of risk of death; an aggravated manslaughter results if the risk is a probability as opposed to a possibility. *State v. Pridgen,* 245 *N.J.Super.* 239, 246, 584 *A.*2d 869 (App.Div.), *certif. denied,* 126 *N.J.* 327, 598 *A.*2d 886 (1991). Similarly, in Pennsylvania, the less culpable version of second-degree malice murder is defined as a homicide committed with "a wickedness of disposition, hardness of heart, cruelty, recklessness, disregard of the consequences, and a mind regardless of social duty, *indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life.*" See *Commonwealth v. Taylor,* 461 *Pa.* 557, 337 *A.*2d 545, 548 (1975) (noting that "between the recklessness or culpable negligence necessary to support the charge of involuntary manslaughter, and the specific intent to kill which is a prerequisite of murder of the first degree, there is a class of wanton and reckless conduct which manifests such an extreme indifference to the value of human life which transcends the negligent killing and reaches the level of the malice which supports a verdict of murder in the second degree") (citation omitted); *Commonwealth v. Coleman,* 455 *Pa.* 508, 318 *A.*2d 716, 718 (1974) (noting that second-degree malice murder is established by "intentional doing of an uncalled-for act in callous disregard of its likely harmful effects on others") (citation omitted).

That our Legislature has, at other times in our statutory history, also defined murder as including the offense now termed manslaughter under the Code does not, as the majority suggests, warrant the Court's according that term a broader construction than that contained in the Code's current definition of murder for purposes of both death-eligibility and death-worthiness.

Nor, as the majority suggests, *ante* at 462–63, 737 *A.*2d at 25–26, does our decision in *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), *aff'd sub nom., Ramseur v. Beyer,* 983 *F.*2d 1215 (3d Cir.1992), *cert. denied,* 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d

653 (1993), support the Court's holding that "murder," however that term may be defined by a foreign jurisdiction, is an admissible aggravating factor. The definition of murder was not at issue in *Ramseur* because the New Jersey indictment to which Ramseur pled guilty alleged that he "did willfully, feloniously and of his malice aforethought kill and murder" his victim and "did not mention manslaughter, which would have been charged separately." *Id.* at 274, 524 *A.*2d 188. The issue in *Ramseur* was whether a *non vult* plea to an indictment for first-degree murder could be used as a prior "conviction" to trigger death-eligibility. Ramseur argued that the plea should not carry the same weight as a conviction after trial because of the possibility that he may have been convicted of a lesser offense, such as manslaughter, had he chosen to go to trial and contest the indictment. *Id.* at 272, 524 *A.*2d 188. We did not decide in *Ramseur* that a conviction for "murder" is on its face an admissible aggravating factor; rather, our decision was founded on the well-settled principle that "a *non vult* plea is regarded as the equivalent of a guilty plea to the charge to which defendant has pleaded." *Id.* at 273, 524 *A.*2d 188. Simply put, Ramseur had pleaded guilty to murder, not manslaughter, and his *non vult* plea had the same legal significance as a conviction by a jury. *Id.* at 272–73, 524 *A.*2d 188.

In *Ramseur,* we observed that courts "ordinarily will not look behind the fact of the conviction because the conviction itself is the statutory aggravating factor." *Id.* at 276, 524 *A.*2d 188 (footnote omitted). Rather than requiring the State to reprove the allegations of the former offense, the conviction itself is used, we explained, "because of the high degree of its reliability [and] because of the time and energy that would be spent trying to prove the prior murder through a trial within a trial." *Id.* at 278, 524 *A.*2d 188. Where, as in *Ramseur,* "[i]t is simply undeniable that [the defendant] was convicted, and that he was convicted of murder," *id.* at 272, 524 *A.*2d 188, we refused to engage in futile speculation about what verdict a jury may have rendered had the matter been tried. The majority, seizing on *Ramseur* 's refusal to "look behind the conviction" to reexamine the facts underlying a

valid conviction for murder, makes an unjustifiable leap of logic in concluding that a prior murder conviction is *ipso facto* admissible, without any inquiry into its qualification as an aggravating factor as a matter of law. In so holding, the majority fails to recognize that a prior conviction is reliable only as proof that a defendant committed the crime for which he was convicted; it cannot establish a prior "murder" conviction if the offense for which he was convicted would have been manslaughter as a matter of New Jersey law.

In an analogous context, the court in *State v. Hines*, 109 *N.J.Super.* 298, 263 *A.*2d 161 (App.Div.), *certif. denied*, 56 *N.J.* 248, 265 *A.*2d 703, *cert. denied*, 400 *U.S.* 867, 91 *S.Ct.* 108, 27 *L.Ed.*2d 106 (1970), refused to allow the admission of a foreign conviction as evidence of the defendant's habitual-offender status unless the offense would qualify as a high misdemeanor in this State, a prerequisite for admission under *N.J.S.A.* 2A:85–12. 109 *N.J.Super.* at 302–03, 263 *A.*2d 161. Accordingly, the court struck the allegations regarding three of the defendant's prior Pennsylvania convictions because the offenses would not qualify as high misdemeanors under New Jersey law: a prior conviction for prison breach was stricken because that offense was not a high misdemeanor in New Jersey; a prior theft conviction was stricken for failure to meet the $200 limitation of our theft statute; and a prior conviction for bringing stolen property into the state was stricken because the comparable offense in New Jersey was only a misdemeanor. *Id.* at 303, 263 *A.*2d 161.

On Hines's appeal, he contended that a prior Pennsylvania larceny conviction considered in the habitual-offender trial also was not the equivalent of a high misdemeanor in this State. *Id.* at 304, 263 *A.*2d 161. The Pennsylvania larceny statute read that "[w]hoever commits larceny, is guilty of a felony, and shall, upon conviction thereof, be sentenced. . . ." *Ibid.* The relevant New Jersey statute "provided that any person who steals money, goods, chattels or other personal property of another is guilty of a misdemeanor, if the price or value of such property was under $50

and, if over $50 is guilty of a high misdemeanor." *Ibid.* Hines claimed that, looking merely at the statute, "the Pennsylvania offense could possibly have been no more than a mere misdemeanor, and so could not be considered under [the habitual-offender statute]." *Id.* at 304–05, 263 *A.*2d 161. The court rejected that argument, noting that because the indictment stated the amount of money stolen—$564—the court was able conclusively to determine that the offense would have been a high misdemeanor, as defined by New Jersey law, and that it properly had been admitted at Hines's trial. *Id.* at 305–06, 263 *A.*2d 161.

Significantly, in both *Ramseur* and *Hines,* the courts were able to verify, simply by looking at the prior record of conviction, whether the prior offenses fell within the definition of the relevant New Jersey offense: in *Ramseur* because the defendant did not contest the indictment charging him with willful murder; and in *Hines* because the indictment stated the objective fact of the amount of money stolen. Similarly, in each of the cases cited by the majority allowing the admission of a prior conviction from a foreign jurisdiction, it was possible, without the necessity of any inference or speculation, for the forum court to determine conclusively whether the foreign conviction fell within the scope of a comparable offense in the forum state. See *People v. Guest,* 115 *Ill.*2d 72, 104 *Ill.Dec.* 698, 503 *N.E.*2d 255, 263–67 (1986) (upholding admission of prior California murder conviction as aggravating death-eligibility factor, after conducting comparative analysis of Illinois and California murder statutes and concluding they were "substantially similar" in requiring "virtually identical" mental states to sustain murder conviction), *cert. denied,* 483 *U.S.* 1010, 107 *S.Ct.* 3241, 97 *L. Ed.*2d 746 (1987); *Grasso v. State,* 857 *P.*2d 802, 808–09 (Okl.Crim.App.1993) (questioning admissibility of defendant's prior conviction under Florida's aggravated battery statute, which included provision allowing conviction for conduct that would be considered only as misdemeanor under Oklahoma law, but finding it unnecessary to resolve issue because defendant's second prior Florida conviction for robbery, under statute "substantially similar" to Oklahoma's, "sufficiently supported the trial

judge's finding of [prior felony] aggravating circumstance beyond a reasonable doubt"); *Commonwealth v. Maxwell,* 534 *Pa.* 23, 626 *A.*2d 499, 501 (refusing to recognize, on *res judicata* grounds, defendant's claim that prior felony conviction was improperly admitted in penalty phase because New York conviction for possession of loaded weapon would have been misdemeanor in Pennsylvania, but observing that New York offense was more serious offense and was not equivalent to Pennsylvania's statute, which proscribed both loaded and unloaded weapons), *cert. denied,* 510 *U.S.* 995, 114 *S.Ct.* 558, 126 *L. Ed.*2d 459 (1993); *State v. Norris,* 285 *S.C.* 86, 328 *S.E.*2d 339, 344–45 (1985) (vacating defendant's death penalty based on erroneous admission of prior second-degree murder conviction under Virginia statute that did not require mental state of malice and therefore did not qualify as aggravating factor under South Carolina law), *overruled on other grounds, State v. Torrence,* 305 *S.C.* 45, 406 *S.E.*2d 315 (1991).[1]

Here, in contrast to *Ramseur, Hines,* and the foregoing out-of-state cases, our objective examination of the Pennsylvania record of conviction cannot possibly shed light on the one fact necessary in order to conclude that defendant was, in fact, convicted of murder rather than manslaughter, i.e., on which ground—intent or callous indifference—the jury's verdict rested. The Court's conclusory observation that defendant's conduct "reasonably can be viewed as sufficient to satisfy a purpose[ful] or knowing[ ] murder" under *N.J.S.A.* 2C:11–3a(1) or (2), *ante* at 463, 737 *A.*2d at 26, is not an adequate basis for upholding the admission of the prior conviction. That conclusion requires the very speculation about a jury's thought processes, or "looking behind the conviction," that we found inappropriate in *Ramseur.*

---

[1] *Miller v. State,* 280 *Ark.* 551, 660 *S.W.*2d 163 (1983), and *State v. Taylor,* 304 *N.C.* 249, 283 *S.E.*2d 761 (1981), *cert. denied,* 463 *U.S.* 1213, 103 *S.Ct.* 3552, 77 *L.Ed.*2d 1398 (1983), also cited by the majority, involved the propriety of the state's having introduced allegedly inflammatory evidence of the prior crime rather than simply admitting the conviction as an aggravating circumstance. Those cases, while impliedly recognizing the admissibility of a foreign conviction, do not address the question presented in this appeal.

512

The Court's most glaring error lies in its attempt to distinguish "callous indifference" malice under Pennsylvania law from the mental state of recklessness required under New Jersey law for a conviction of aggravated manslaughter. The Court states:

> When the Pennsylvania court defined malice, use of the phrase "recklessness of consequences and a mind regardless of social duty indicating an unjustifiable disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life," does not come close to being equivalent to the recklessness standard required for manslaughter under *N.J.S.A.* 2C:11–4. The phrase in the Pennsylvania malice charge that included "recklessness" when viewed in the context of shooting the victim through the neck and between the eyes more closely satisfies the definitions of acting purposely or knowingly, *N.J.S.A.* 2C:2–2b(1) and (2), than the definition of recklessness in *N.J.S.A.* 2C:2b(3).
>
> [*Ante* at 463–64, 737 *A.2d* at 26.]

The Court's suggestion that the evidence of defendant's Pennsylvania trial may have been adequate to sustain a conviction for purposeful murder begs the question. But the Court errs grievously when it states that "callous indifference" malice under Pennsylvania law "does not come close to being equivalent to the recklessness standard required for manslaughter" under New Jersey law. Under our manslaughter statute, *N.J.S.A.* 2C:11–4, "[c]riminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life." Under the Code, *N.J.S.A.* 2C:2–2, "[a] person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." In defendant's Pennsylvania trial the court's secondary definition of malice was "a wickedness of disposition, hardness of heart, cruelty, recklessness, disregard of the consequences, and a mind regardless of social duty, indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life." Contrary to the Court's conclusion, the Pennsylvania court's secondary definition of malice parallels in many respects New Jersey's definition of recklessness and the elements of aggravated manslaughter. Both definitions emphasize recklessness as the crucial mental state, as well as a "[conscious] disregard" of conse-

quences and "extreme indifference to human life." A fair reading of the two relevant definitions demonstrates that the Pennsylvania court's secondary definition of malice is the essential equivalent of aggravated manslaughter under New Jersey law.

### III

The Court's inexacting level of scrutiny is simply insufficient when the issue is whether the evidence supports a prior-murder-conviction aggravating factor. Where, as here, the record leaves the reviewing court uncertain about the actual ground on which the jury's decision rested, and one ground would not be admissible as an aggravating factor, the appropriate remedy is the reversal of defendant's death sentence and a remand for resentencing. See *Zant v. Stephens,* 462 *U.S.* 862, 881, 103 *S.Ct.* 2733, 2745, 77 *L.Ed.*2d 235, 252 (1983) (noting rule that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground") (citing *Stromberg v. California,* 283 *U.S.* 359, 369–70, 51 *S.Ct.* 532, 535–36, 75 *L.Ed.* 1117, 1123 (1931)). Consistent with that doctrine, this Court in *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), refused to rely for death-eligibility purposes on any jury verdict that failed to state explicitly whether the conviction reflected the jury's finding that the defendant intended to kill, or to inflict serious bodily injury on the victim. *Id.* at 92, 549 *A.*2d 792.

Nor should we expand death-eligibility to include prior offenders whose crimes never would have been presented for the jury's consideration if committed in this State, simply because the foreign jurisdiction defines the offense of murder more broadly than does New Jersey. As we noted in *Ramseur:*

> By establishing a prior conviction as an aggravating factor the State adequately fulfills its constitutional duty to "narrow the class of persons eligible for the death penalty and ... [to] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."

[*Ramseur, supra,* 106 *N.J.* at 276, 524 *A.*2d 188 (quoting *Zant, supra,* 462 *U.S.* at 887, 103 *S.Ct.* at 2748, 77 *L.Ed.*2d at 249–50) (alteration in original).]

The States have been accorded considerable latitude in defining the factors, both statutory and non-statutory, that may be considered in deciding a defendant's death-worthiness. See *Barclay v. Florida,* 463 *U.S.* 939, 956, 103 *S.Ct.* 3418, 3428, 77 *L.Ed.*2d 1134, 1148 (1983) (stating that "[t]he trial judge's consideration of Barclay's criminal record as an aggravating circumstance was improper as a matter of *state* law") (emphasis added); *Zant, supra,* 462 *U.S.* at 878–79, 103 *S.Ct.* at 2747, 77 *L.Ed.*2d at 251 (holding no constitutional violation occurs if a state permits consideration of non-statutory aggravating factors in the penalty phase of a capital case). Therefore, the fairness and rationality of death-penalty proceedings depends almost entirely on each state's strict and uniform adherence to its own procedures to channel a jury's discretion in imposing the penalty of death. We fail in that constitutional duty, and introduce into the process an element of uncertainty and irrationality, when we allow the existence of an aggravating factor to be determined by whether defendant's prior crimes were committed in this or another State. An aggravating factor based on so arbitrary a standard cannot "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Ramseur, supra,* 106 *N.J.* at 276, 524 *A.*2d 188 (quoting *Zant, supra,* 462 *U.S.* at 887, 103 *S.Ct.* at 2748, 77 *L.Ed.*2d at 249–50).

HANDLER, J., joins in this dissent.

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, GARIBALDI and COLEMAN—4.

*For reversal*—Justices HANDLER, O'HERN and STEIN—3.